**Jon P. Schwartz v. Arvid and Karen Frankenhoff,
Dover Foods, Inc., Trustee,
Bernard Food Industries, Inc. and
Shefsky & Froelich, Ltd.**

[733 A.2d 74]

No. 98-154

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed May 21, 1999

288

*Alan B. George* of *Keyser, Crowley, Carroll, George & Meub, P.C.,* Rutland, for Defendants-Appellants.

*Stephen L. Saltonstall,* Manchester Village, for Defendants-Appellees.

**Dooley, J.** Arvid and Karen Frankenhoff appeal from an order of the superior court dismissing their tort claims against Bernard Food Industries, Inc. ("Bernard Foods") and Shefsky & Froelich, Ltd. Bernard Foods is an Illinois-based food wholesaler; Shefsky & Froelich is a Chicago law firm. The Frankenhoffs, who were originally named as defendants in this proceeding, impleaded Bernard Foods and Shefsky & Froelich as additional defendants in their counter-claims asserted against plaintiff Jon P. Schwartz, but the court

concluded it lacked personal jurisdiction over either of the parties it dismissed. We agree and affirm.

In granting the two Illinois defendants' motion for dismissal under V.R.C.P. 12(b)(2), the trial court did not conduct an evidentiary hearing, relying instead on the pleadings and affidavits submitted by the parties. From those sources, we glean the following summary of the proceeding, claims and underlying facts of record.

Schwartz originally asserted claims against the Frankenhoffs for breach of contract and deceit. At issue was a food wholesaling entity known as American Quality Foods, Inc. (AQF), the stock of which Schwartz and the Frankenhoffs each owned 50 percent. According to the complaint, Schwartz and the Frankenhoffs entered into a settlement agreement in 1992 whereby Schwartz agreed to sell his shares in the company to the Frankenhoffs in exchange for the Frankenhoffs paying off a $40,000 bank note secured by Schwartz. Schwartz alleged that the Frankenhoffs breached the agreement by failing to pay off the note and then selling the company to an outside purchaser, misrepresenting themselves as sole owners.

The Frankenhoffs' counterclaim alleged that Schwartz and Arvid Frankenhoff had formerly been employed by Bernard Foods but that both eventually left that company's employ. According to the Frankenhoffs, they invited Schwartz to join them as co-owners of AQF in 1990 under a plan that called for the Frankenhoffs to remain in Vermont and Schwartz to service midwestern customers from his base in South Dakota. This business arrangement apparently did not thrive. According to the counterclaim, Schwartz resigned from his positions as director, vice-president and employee of AQF in December 1991. The Frankenhoffs allege that, just prior to Schwartz's resignation, he had engaged in secret negotiations with Bernard Foods in order to rejoin its employ. Further, they allege that Schwartz and Bernard Foods conspired to destroy AQF, to ruin the Frankenhoffs financially and thereby to inflict emotional distress upon them.

Various conspiratorial acts are alleged in the counterclaim. They fall in two main groups. The first group of allegations involves actions related to AQF's finances. In order to finance its activities, AQF had two lines of credit from different banks. One of these lines of credit, according to the Frankenhoffs, was obtained at Schwartz's insistence after he began negotiations with Bernard Foods. According to the counterclaim, shortly before his resignation, Schwartz acquired blank AQF letterhead, a complete statement of its inventory and a list of its

customers. Shortly after his resignation, Schwartz mailed a letter to AQF's midwestern and plains state customers, on AQF letterhead, requesting that they send all money owed AQF to one of the banks which had extended credit to AQF. The Frankenhoffs alleged that this act was done to show customers that AQF was in financial difficulty so that they would switch to Bernard Foods, and was effective to accomplish this purpose. They alleged that Schwartz also contacted the banks that had extended credit urging them to demand that customer payments be made directly to them. Although AQF was not in default, the Frankenhoffs complained that the contacts led the banks to refuse to extend further credit, causing AQF to fail. Eventually, AQF defaulted on its obligations to one of the banks, and the bank pursued collateral in the hands of Schwartz and the Frankenhoffs. The counterclaim alleges that Schwartz reacquired his collateral by a payment funded by Bernard Foods.

The counterclaim alleges that Shefsky & Froelich was counsel to Bernard Foods and was intimately involved in the above acts that the Frankenhoffs deem unlawful, ostensibly representing Schwartz in communications with AQF customers, the banks and the Frankenhoffs while acting for the conspiracy. It alleges that in interactions with the Frankenhoffs, the conduct of a firm lawyer was "outrageous and unprofessional" and "demeaning and intimidating" while also "misrepresent[ing] the true facts."

The second group of allegations relates to certain of AQF's products that, the Frankenhoffs alleged, were made from proprietary formulas and recipes that were trade secrets of AQF and the Frankenhoffs. According to the Frankenhoffs, Schwartz acquired samples of these products and gave them to Bernard Foods — which, based on laboratory analysis, was able to produce and sell them under the Bernard Foods label.

In support of their motion to dismiss, the Illinois defendants submitted affidavits executed by Steven Bernard and Gary Levenstein. Bernard identified himself as president of Bernard Foods; stated that Schwartz was, at the time Bernard executed his affidavit, the company's sales representative in North Dakota, South Dakota and parts of Minnesota; and averred that he had agreed to so employ Schwartz after Schwartz severed ties with the Frankenhoffs because both Schwartz and his father had previously worked for the company. According to Bernard's affidavit, at no time did he and Schwartz discuss, plan or carry out any efforts to compete with or harm either the Frankenhoffs or AQF. Bernard also stated that his

company had never engaged in such an effort. He further averred that Vermont customers represented less than .05 percent of Bernard Foods' total sales; that the company has no offices, property or representatives in Vermont; and that the company's Vermont customers are serviced through representatives located in Massachusetts and New Hampshire.

Levenstein's affidavit identified him as a partner in the Shefsky & Froelich firm. He stated that Shefsky & Froelich represented Schwartz and not Bernard Foods in connection with disputes arising out of the failure of AQF, although Levenstein conceded his firm has represented Bernard Foods on other matters. Levenstein stated that the firm had conducted most of its negotiations with the Frankenhoffs through their attorney, based in Massachusetts. However, according to Levenstein, following the 1993 settlement agreement the Frankenhoffs ceased to be represented by counsel, and his firm therefore sent three letters directly to them in Vermont and spoke with them twice by telephone. Levenstein also alluded to telephone and written contact with AQF's Vermont lenders. According to Levenstein, this contact occurred "because our client, Mr. Schwartz, was personally liable for [AQF's] obligations" and "did not relate to the claims raised by the Frankenhoffs." Levenstein noted that his firm had no lawyers licensed to practice in Vermont, maintained no offices in the state, and had neither clients nor property in Vermont.

Both Arvid and Karen Frankenhoff submitted affidavits in opposition to the dismissal motion. In support of his contention that Shefsky & Froelich was "really working as an agent of Bernard," Arvid Frankenhoff appended to his affidavit a facsimile cover sheet from the law firm, dated July 23, 1993 and addressed to Karen Frankenhoff, which lists "Bernard Foods" in the space designated for "client name." Arvid Frankenhoff noted that the firm's client number as it appears on the form is the same client number that appears on other documents the Frankenhoffs have received from the firm. His affidavit also includes a copy of a letter from the firm, dated September 8, 1993 and addressed to Karen Frankenhoff, indicating that copies of the letter were sent both to Schwartz and to Steven Bernard.

The superior court granted the motions to dismiss of both counterclaim defendants. In an entry order made before the filing of the Frankenhoff affidavits, the court determined that it was the Frankenhoffs' burden to make a prima facie showing of jurisdiction and gave them twenty days to submit additional evidence to support the counterclaims, specifically "a verified statement of jurisdictional

facts, based on personal knowledge, showing specific tortious or unlawful acts by each of the additional defendants, sufficient to demonstrate . . . minimum contacts." Following the submission of the affidavits, the court dismissed the counterclaim as to the Illinois defendants, concluding that the counterclaim and affidavits were "too vague to support a conclusion that any wrongdoing has occurred" and that the claims were not supported by evidence.

On appeal, the Frankenhoffs argue that the affidavits, and the counterclaim which was verified in an affidavit, made out a conspiracy that committed a number of torts: intentional interference with contractual relationships, defamation and disparagement, theft of trade secrets and unfair competition. They argue that they demonstrated sufficient jurisdictional facts to show personal jurisdiction on the theory that counterclaim defendants committed torts within the state. Further, they argue that if their showing was inadequate, they should have been allowed additional time for discovery.

█ Under the applicable Vermont long-arm statute, a foreign corporation is "deemed to be doing business in Vermont," and thus to have appointed the secretary of state as its agent for service-of-process purposes, if the corporation has had "contact with the state," has conducted "activity in the state" or there has been "contact or activity imputable to it . . . sufficient to support a Vermont personal judgment against it . . . arising or growing out of that contact or activity." 12 V.S.A. § 855. Section 855 "expresses a policy to assert jurisdiction over foreign corporations to the full extent permitted by the Due Process Clause of the Fourteenth Amendment." *Chittenden Trust Co. v. Bianchi*, 148 Vt. 140, 141, 530 A.2d 569, 570 (1987) (citation omitted). Thus, the question of whether a Vermont court has jurisdiction over these defendants is one of federal constitutional law requiring the court to decide whether the defendants seeking dismissal have had sufficient "minimum contacts" with Vermont "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[1] *Id.* (quoting *International Shoe*

---

[1] The Frankenhoffs have claimed jurisdiction based on 12 V.S.A. § 855, and not on 12 V.S.A. § 913, a separate long-arm statute that applies to any party served with process "outside the state." 12 V.S.A. § 913. As with § 855, we have held that § 913 "confers jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Dall v. Kaylor*, 163 Vt. 274, 275, 658 A.2d 78, 79 (1995) (citations omitted). Unlike § 855, § 913 allows long-arm jurisdiction based on "general jurisdiction," i.e., sufficient contacts such that jurisdiction is available over a defendant even with respect to claims that do not arise out of those contacts. See *Helicopteros*

*Co. v. Washington*, 326 U.S. 310, 316 (1945)) (other citation and internal quotation marks omitted). The "critical consideration" under such an analysis is whether defendants' "'conduct and connection with the forum State'" are such that they "'should reasonably anticipate being haled into court there.'" *Dall*, 163 Vt. at 276, 658 A.2d at 79 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980)) (other citation omitted). It is essential to a finding of personal jurisdiction that a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

As the Frankenhoffs note, the United States Supreme Court has held that due process permits the exercise of personal jurisdiction over a party who intentionally acts outside the forum state to cause tortious harm within the forum state. See *Calder v. Jones*, 465 U.S. 783, 788-89 (1984) (sustaining personal jurisdiction in forum that was "focal point" of harm resulting from libel committed outside forum). We first examine whether the Frankenhoffs have made a sufficient showing to establish jurisdiction over Bernard Foods on this basis.

The Frankenhoffs rely primarily on the theory that Bernard Foods, even though it had no presence in Vermont nor committed any acts that directly resulted in tortious injury here, is a participant in a conspiracy and that other members of the conspiracy, primarily Schwartz, did directly cause tortious injury in Vermont. Although the federal court in Vermont has addressed such a jurisdictional claim in two separate cases, see *Vermont Castings, Inc. v. Evans Products Co.*, 510 F. Supp. 940, 943-45 (D. Vt. 1981); *Turner v. Baxley*, 354 F. Supp. 963, 976-78 (D. Vt. 1972), we have not formerly examined whether participation in a conspiracy is sufficient to allow personal jurisdiction over an absent participant when other members of the conspiracy cause tortious injury in Vermont.

The United States Supreme Court has also not decided whether participation in a conspiracy, without other contacts with a jurisdiction, is sufficient to meet due process requirements for personal jurisdiction. Its decisions strongly suggest, however, that conspiracy

---

*Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 (1984) (explaining general jurisdiction); *Braman v. Mary Hitchcock Mem'l Hosp.*, 631 F.2d 6, 8-9 (2d Cir. 1980) (noting that general jurisdiction available under § 913). Thus, the Frankenhoffs have not made allegations of continuous and systematic contact with the forum state, unrelated to allegations in their complaint, such that we could find general jurisdiction over the counterclaim defendants.

participation is not enough. In *Calder*, the main case relied upon by the Frankenhoffs, the Court directed that "[e]ach defendant's contacts with the forum State must be assessed individually." 465 U.S. at 790; see also *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (minimum contacts must be shown for each individual defendant); *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (same). Because the conspiracy theory of jurisdiction would attribute one party's contacts to another's, some courts have held personal jurisdiction cannot be based solely on participation in a conspiracy. See *Insolia v. Philip Morris Inc.*, 31 F. Supp. 2d 660, 673 (W.D. Wis. 1998); *Mansour v. Superior Court*, 46 Cal. Rptr. 2d 191, 198 (Ct. App. 1995); *Hewitt v. Hewitt*, 896 P.2d 1312, 1316 (Wash. Ct. App. 1995); see generally L. Brilmayer & K. Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Cal. L. Rev. 1 (1986); A. Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Ford. L. Rev. 234 (1983); Comment, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction*, 84 Colum. L. Rev. 506 (1984).

Of the courts that have recognized the conspiracy theory of in personam jurisdiction, many have adopted the elements first set out by the Delaware Supreme Court in *Istituto Bancario Italiano v. Hunter Engineering Co.*, 449 A.2d 210, 225 (Del. 1982):

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

See also *Hercules Inc. v. Leu Trust & Banking Ltd.*, 611 A.2d 476, 482-85 (Del. 1992) (reaffirming and applying the elements required in *Hunter Engineering*).

We need not decide whether to adopt a conspiracy theory of in personam jurisdiction to review the decision to dismiss Bernard

Foods in this case. Our decision is based less on the elements necessary to find jurisdiction and more on the showing required of the party seeking to invoke it. No court will accept conclusory allegations of a conspiracy, without more, as sufficient to establish personal jurisdiction over an alleged member of the conspiracy. See, e.g., *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93-94 (2d Cir. 1975) (rejecting "bland assertion of conspiracy or agency" as sufficient to sustain personal jurisdiction). Courts in other jurisdictions have reached different conclusions on what allegations, evidence or proof will be considered sufficient.

Our recent decision in *Godino v. Cleanthes*, 163 Vt. 237, 656 A.2d 991 (1995), demonstrates how we approach this question. In *Godino*, jurisdiction turned on whether the defendant remained a domiciliary of Vermont or had moved her domicile to another state. We held that although it was preferable to decide the question based on an evidentiary hearing, the court could reach its decision based only on affidavits presented with and against the motion to dismiss. In such a case "the party opposing a motion need make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction." *Id.* at 239, 656 A.2d at 992. The court's decision is one of law, "and appellate review is nondeferential and plenary." *Id.* at 239, 656 A.2d at 992-93.

In reaching this decision establishing the initial burden to sustain jurisdiction, we relied in part on the First Circuit Court of Appeals decision in *United Electrical Radio & Machine Workers of America v. 163 Pleasant St. Corp.*, 987 F.2d 39 (1st Cir. 1993). That decision elaborates on the nature of the burden imposed in the circumstances on the nonmoving parties: "The prima facie showing must be based upon evidence of specific facts set forth in the record." *Id.* at 44. This requires the nonmoving parties to "go beyond the pleadings and make affirmative proof." *Id.* (citation omitted). In assessing the submitted materials, the court eschews fact finding and simply accepts "properly supported proffers of evidence" as true and rules on the jurisdictional question as a matter of law. *Id.*; see also *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145-47 (1st Cir. 1995) (describing the three levels of inquiry the court can employ to determine whether personal jurisdiction is present).

We agree with the superior court that the Frankenhoffs failed to make sufficient properly-supported proffers of evidence to allow an assertion of personal jurisdiction, based on Bernard Foods' participation in a conspiracy, assuming we accepted such a theory of

jurisdiction. Under any articulation of the elements necessary to show personal jurisdiction by participation in a conspiracy, the party asserting jurisdiction must show that there was a conspiracy and that the party over which jurisdiction is sought participated in that conspiracy. All of the Frankenhoffs' factual assertions are contained in the counterclaim and their affidavits. With a few exceptions, the counterclaim and affidavits contain only general and conclusory statements that Bernard Foods was a co-conspirator with Schwartz and Shefsky & Froelich and is responsible for their tortious acts. The exceptions are: (1) Bernard Foods employed Schwartz; (2) Bernard Foods chemically analyzed AQF's products, copied them and sold copied products under their name; (3) a Shefsky & Froelich lawyer sent a facsimile transmission to Arvid Frankenhoff in 1993, the cover sheet of which indicated the lawyer's client was Bernard Foods; and (4) the lawyer sent a letter to Arvid Frankenhoff with a copy to the president of Bernard Foods.[2]

Neither of the first two facts support the presence of a conspiracy, or Bernard Foods' participation in it. The Frankenhoffs do not argue that either of these acts, alone, breached a duty owed to them or was tortious.[3] Nor is there any indication of how the Frankenhoffs have personal knowledge of chemical analyses performed by Bernard Foods or the chemical composition of Bernard Foods products.

We agree that the third and fourth facts raise suspicion that in 1993 Shefsky & Froelich was acting for Bernard Foods, as well as for Schwartz, despite its denial. The letter and facsimile transmission, however, were sent between eighteen months and two years after the main acts alleged to have been tortious. We conclude that they do not constitute a sufficient prima facie showing as to the existence of a

---

[2] In addition to the four facts itemized above, Frankenhoffs alleged that they believed that Bernard Foods funded the payment made by Schwartz to reclaim his collateral. We do not consider this allegation, as it is expressly labeled a belief. In any event, we do not see how this fact adds much to the conspiracy claim, and it may explain the letter and facsimile transmission discussed *infra.*

[3] If we understand the Frankenhoffs' argument on its allegation that Bernard improperly stole trade secrets, it is that Bernard's actions were tortious because Schwartz gave them samples of the products to analyze. There is no allegation, however, that Schwartz gave Bernard Foods the *secret,* namely the composition of the products. See, e.g., 9 V.S.A. § 4601(3) (defining "trade secret" as "information, including a formula" that derives actual or potential economic value from not being generally known to or readily ascertainable by others using proper means and is subject to reasonable efforts to maintain secrecy) (uniform act applicable as of 1996 in Vermont). Thus, the allegation is that Bernard Foods used samples it could have purchased on the open market. We fail to see how Schwartz's conduct made tortious the chemical analysis or product copying.

conspiracy involving Bernard Foods and commencing in December of 1991.

■ For the above reasons, we do not believe the Frankenhoffs have shown that personal jurisdiction in Vermont under 12 V.S.A. § 855 was proper over Bernard Foods. The superior court was correct to grant Bernard Foods' motion to dismiss.

Our conclusion with respect to Shefsky & Froelich is similar, although other considerations are involved. The heart of the Frankenhoffs' complaint against the law firm is that its lawyers, while ostensibly representing Schwartz, were really engaged in a conspiracy with Schwartz and Bernard Foods to destroy the Frankenhoffs' business to eliminate competition for Schwartz and Bernard Foods. As detailed in the counterclaim and affidavits, however, all of the lawyers' acts were ostensibly taken for the client, Schwartz, and can be fully explained by Schwartz's desire to liquidate his interest in AQF and avoid liability for AQF debts that he personally guaranteed. As with Bernard Foods, we cannot conclude that the Frankenhoffs made the requisite prima facie showing to assert jurisdiction over Shefsky & Froelich as a conspirator.

■ We recognize, however, that unlike Bernard Foods, Shefsky & Froelich had contact with Vermont through letters and telephone calls to Vermont residents. We doubt these contacts are sufficient by themselves to create jurisdiction over the law firm. See *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994) (no jurisdiction in case where defendant-attorney placed telephone call to forum in course of representing class-action plaintiffs); *Star Technology, Inc. v. Tultex Corp.*, 844 F. Supp. 295, 298 (N.D. Tex. 1993) (attorney's "sporadic contact" based on two trips to forum insufficient to support jurisdiction in copyright infringement suit by competitor of attorney's client). More importantly, these contacts lack significance when viewed in isolation from the conspiracy allegation. An attorney is not liable in tort to a nonclient simply because the lawyer represents a tortfeasor; some independent wrong committed by the attorney rather than the client is a prerequisite to the attorney's personal liability to such a third party. See, e.g., *Allied Financial Servs., Inc. v. Easley*, 676 F.2d 422, 422-23 (10th Cir. 1982) (holding that under Colorado law attorney owes duty to adversaries not to engage in fraud or malicious conduct or to commit intentional torts); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1080 (2d Cir. 1977) (although attorney "generally is not responsible for the motives of his

clients, admission to the bar does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal rights of others") (applying New York law); *Fraidin v. Weitzman*, 611 A.2d 1046, 1080 (Md. Ct. Spec. App. 1992) ("while an attorney is acting within the scope of his employment, he may not commit fraud or collusion, or a malicious or tortious act, even if doing so is for the benefit of the client"); *Schuler v. Meschke*, 435 N.W.2d 156, 162-63 (Minn. Ct. App. 1989) (dismissing negligence-based claim against attorney by nonclients); *Giuliani v. Chuck*, 620 P.2d 733, 736-37 (Haw. Ct. App. 1980) ("The rule of law that an attorney representing a client may be held personally liable to an adverse party or a third person who sustains injury as a result of an attorney's intentional tortious act is well settled."); see also *Scholler v. Scholler*, 462 N.E.2d 158, 163 (Ohio 1984) (under Ohio law, attorneys immune from liability to nonclients for acts taken in course of representation absent proof attorney acted maliciously). With one possible exception, discussed below, none of the acts attributed to Shefsky & Froelich lawyers would give rise to their liability to the Frankenhoffs unless they were in furtherance of a conspiracy.

We would reach a similar conclusion as a matter of "fair play and substantial justice." As the Supreme Court held in *Burger King*, 471 U.S. at 476, the contacts of a defendant must be viewed "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" (quoting *International Shoe*, 326 U.S. at 320). One of those factors is the shared interest of the states "in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292. We agree with the conclusion of the court in *American Life & Casualty Insurance Co. v. First American Title Co.*, 772 F. Supp. 574, 579 (D. Utah 1991), that an important policy interest favors dismissal in this case:

> Public policy also favors the dismissal of [the lawyer defendant] from this action. Attorneys are often asked to perform services for their local clients which services may have some impact in another jurisdiction. To require an attorney to submit to personal jurisdiction in a foreign jurisdiction each time the attorney communicates instructions on behalf of a client does not comport with fundamental fairness. The mere communication of such instructions may not be considered a purposeful availment of the privilege of conducting activities within a foreign jurisdiction.

(Citations omitted.)

The one possible exception is the alleged conduct of James Asmussen, a Shefsky & Froelich lawyer, in the late summer of 1993. The counterclaim alleges that Shefsky & Froelich "wilfully, wantonly and outrageously" demanded more from the Frankenhoffs than they could provide and Asmussen was "demeaning and intimidating." The counterclaim goes on to state the actions of all the counterclaim defendants caused both Arvid and Karen Frankenhoff to suffer "emotional and mental distress." In his affidavit, Arvid Frankenhoff stated that the basis for his claim against Shefsky & Froelich, as outlined above, was a series of letters between James Asmussen and Karen Frankenhoff, which were attached. These letters began in May 1993 when Schwartz was notified that AQF had defaulted on one of the bank loans. The initial letter from Asmussen stated that the Frankenhoffs were in breach of the settlement agreement because of the default and threatened legal action. Asmussen sent two more demand letters, one rejecting a settlement offer made by Karen Frankenhoff, before filing suit.

The above allegations against Shefsky & Froelich can be interpreted as charging the firm with intentional infliction of emotional distress, although the counterclaim does not mention this tort. To make out this tort, the plaintiff must show "extreme and outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, that has resulted in the suffering of extreme emotional distress." *Denton v. Chittenden Bank,* 163 Vt. 62, 66, 655 A.2d 703, 706 (1994); see also *Baldwin v. Upper Valley Services, Inc.,* 162 Vt. 51, 55, 644 A.2d 316, 318 (1994). The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'" *Denton,* 163 Vt. at 66, 655 A.2d at 706 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

■ Although we recognize that we are reviewing a motion to dismiss for lack of jurisdiction and not a summary judgment decision, we still deem it appropriate to note that the Frankenhoffs' allegations fall far short of showing the elements of intentional infliction of emotional distress. At best, the letters show that Shefsky & Froelich demanded payment from debtors who could not pay and rejected a settlement offer that would have provided their client far less than the amount owed. We conclude that the court was correct in holding that the Frankenhoffs have not shown jurisdiction over Shefsky & Froelich on a theory of intentional infliction of emotional distress.

Having concluded that the superior court was correct to dismiss the counterclaim against Bernard Foods and Shefsky & Froelich on the record before it, we must consider the Frankenhoffs' argument that they were improperly denied the opportunity to develop factual support for their claims through discovery. The out-of-state counterclaim defendants filed their motion to dismiss, with attached affidavits, on January 31, 1996. On March 6, 1996, counterclaim plaintiffs answered by memorandum of law, relying on the allegations in the counterclaim. That answer led to the court's order giving counterclaim plaintiffs an additional twenty days to make a factual showing in support of jurisdiction. They filed affidavits of Arvid and Karen Frankenhoff, never contested the court's procedural approach or its deadline for additional evidence and never filed an additional memorandum of law. In these circumstances, we believe the Frankenhoffs have waived any opportunity to develop additional evidence or to complain about the court's deadline to show what evidence they had. See *Hartnett v. Medical Ctr. Hosp.*, 146 Vt. 297, 301, 503 A.2d 1134, 1137 (1985) (holding, in context of appeal relating to adequacy of discovery opportunities, that "a litigant cannot use as grounds for reversal a problem which could have been cured at the time it arose.") (citation omitted).

*Affirmed.*