NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 22

No. 2015-204

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Civil Unit, |
| | Washington Division |
| | |
| Atlantic Richfield Company, et al. | October Term, 2015 |

Mary Miles Teachout, J.

William H. Sorrell, Attorney General, Scot L. Kline, Gavin J. Boyles and Robert F. McDougall, Assistant Attorneys General, Montpelier, Matthew F. Pawa, Benjamin A. Krass and Wesley Kelman of Pawa Law Group, P.C., Newton Centre, Massachusetts, Robert J. Gordon, Robin Greenwald and William A. Walsh of Weitz & Luxenberg, P.C., New York, New York, and Scott Summy, Celeste Evangelisti and Carla Burke Pickrel of Baron & Budd, P.C., Dallas, Texas, for Plaintiff-Appellee.

Harry R. Ryan and Eric J. Morgan of Ryan Smith & Carbine, Ltd., Rutland, and M. Coy Connelly and Amy E. Parker of Bracewell & Giuliani LLP, Houston, Texas, for Defendant-Appellant Total Petrochemicals & Refining USA, Inc.


PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1. **REIBER, C.J.** This interlocutory appeal requires us to examine the contours of the "stream-of-commerce" doctrine of personal jurisdiction, which was introduced by the U.S. Supreme Court in a 1980 decision but later divided the Court with respect to its scope. Defendant Total Petrochemicals & Refining USA, Inc. (TPRI) challenges a decision of the superior court, civil division, denying its motion to dismiss, for lack of personal jurisdiction, plaintiff State of Vermont's complaint alleging that TPRI, along with twenty-eight other

defendants, contaminated the waters of the state by introducing into those waters a gas additive called methyl tertiary butyl ether (MTBE). We affirm.

¶ 2. In June 2014, the State filed a seventy-six-page complaint in the superior court alleging that the decision of the twenty-nine defendants, all major oil and chemical companies, to manufacture MTBE or to refine, blend, or supply gasoline containing MTBE, and/or to promote, market, or distribute the sale of such gasoline, knowing that it would reach and contaminate the waters of the State of Vermont, caused widespread degradation—as well as a threat of future harm—to both surface water and groundwater within the state. The complaint stated that, compared to other gasoline constituents, MTBE contaminates and spreads in water more quickly and resists removal and treatment, thereby presenting a particularly serious threat to state waters. The complaint also stated that defendants were aware of, but concealed, the risks associated with using the additive in gasoline. The complaint set forth nine causes of action, including actions for restoration of damaged natural resources and groundwater in violation of 10 V.S.A. §§ 1390 and 1410, public and private nuisance, trespass, negligence, strict liability for design defect and failure to warn, and civil conspiracy. Among other things, the State sought compensation for damages to natural resources and for the costs of investigating, monitoring, and remediating those damages, as well as injunctive and equitable relief and punitive damages.

¶ 3. In August 2014, TPRI filed a motion to dismiss the complaint for lack of personal jurisdiction, arguing that the company did not have the required minimum contacts with Vermont and that asserting personal jurisdiction over it would violate traditional notions of fair play and substantial justice. Along with the motion, TPRI filed an affidavit of its senior manager for financial accounting, who averred, among other things, that: (1) TPRI is a Delaware corporation engaged in petroleum refining and the manufacture of petrochemicals, with headquarters in Houston, Texas, and facilities in Texas, Louisiana, Colorado, Connecticut, and Alabama; (2) TPRI has never been registered with the Vermont Secretary of State and has never been qualified

2

to do business in the State of Vermont; (3) TPRI has never maintained employees or an office in Vermont and has never entered into a contract with any distributor for the delivery of MTBE, or gasoline containing MTBE, into Vermont; (4) "TPRI never refined gasoline containing MTBE, manufactured MTBE, blended MTBE, supplied gasoline containing MTBE, or otherwise made, marketed, advertised, stored, or sold any product containing MTBE in Vermont"; and (5) from 2006 to the present, only 0.0013% of TPRI's total revenue came from Vermont sales.

¶ 4.    In its opposition to TPRI's motion to dismiss, the State argued that TPRI should be subject to personal jurisdiction in Vermont because it had knowingly placed its fungible commercial products in a national distribution system that included Vermont.  Along with its memorandum of law opposing TPRI's motion, the State submitted an affidavit of its expert, a senior vice-president of an energy and chemicals advisory business, discussing how gasoline is manufactured and distributed to retail gas stations in the United States and in particular the Northeast and Vermont.  The expert explained that gasoline from refineries is commingled in pipelines and sent to various distribution centers, where it is moved by other means of transportation to retail gas stations.  The expert focused in particular on the distribution of gasoline into the East Coast market and from there into New England and Vermont.  The expert opined that although it is impossible to determine the origin of any given gallon of gasoline because of its fungible nature and commingling in transport, over time any supplier of gasoline into the East Coast market will have supplied gasoline throughout the entire supply system, including New England and Vermont.

¶ 5.    Thus, according to the expert, it was "reasonable to conclude" that refiners supplying MBTE-gasoline to the East Coast distribution system understood the fungible nature of the gasoline they produced and the likelihood that, over time, they were supplying MTBE-gasoline to the northern terminus of the Colonial Pipeline in New Jersey and onward to New England and Vermont.  The expert identified three activities by TPRI that linked that company to

3

the supply of MTBE-gasoline in Vermont: (1) blending MTBE-gasoline in New Jersey storage tanks, some of which was more likely than not to have ended up in Vermont; (2) manufacturing MTBE-gasoline in its Texas refinery and shipping it on to the Colonial Pipeline, where more likely than not some of it found its way into Vermont; and (3) selling MTBE to numerous national gasoline marketers over a twenty-year period ending in 2007, with the reasonable expectation that its MTBE would be distributed nationally, including in New England and Vermont.

¶ 6. The State also argued, in the alternative, that if the superior court deemed its submission in opposition to TPRI's motion to dismiss insufficient for the court to exercise personal jurisdiction over TPRI, it should be given the opportunity to engage in discovery on the question of jurisdiction. In response to the State's opposition to its motion, TPRI argued that the undisputed facts and controlling law precluded the State of Vermont from asserting personal jurisdiction over it. TPRI asked the court to deny the State's request for discovery on the jurisdictional question, arguing that the State was not entitled to discovery because it had failed to make a prima facie case by asserting any specific, non-conclusory facts that could establish personal jurisdiction.

¶ 7. Following oral argument on TPRI's motion to dismiss, the superior court denied the motion in a January 16, 2015 decision. The court ruled that "[b]ecause TPRI undisputedly manufactured neat MTBE and MTBE gasoline and sold those products to national distributors who in turn distributed those products for sale in the northeast market, including in Vermont, TPRI has sufficient contacts with the State of Vermont for the exercise of personal jurisdiction over it with respect to alleged injuries resulting from the sale of MTBE gasoline in Vermont." On May 22, 2015, in response to TPRI's motion for reconsideration, the court reiterated that personal jurisdiction was established in Vermont because "TPRI took active steps in sending its products through the Colonial Pipeline from Texas to New Jersey and conducted activities in

4

New Jersey that actively directed its products for distribution and use throughout the entire northeastern United States gasoline market, including Vermont, such that it could have been foreseen being haled into court in Vermont as a destination state."

¶ 8.    On appeal, TPRI argues that the superior court erred by denying its motion to dismiss because neither Vermont's long-arm statute nor established principles of federal due process as set forth in controlling case law permit the exercise of personal jurisdiction over a nonresident defendant based solely on either mere participation in an alleged national market or the unilateral conduct of third parties.

¶ 9.    The superior court "has discretion to decide a pretrial motion to dismiss for lack of personal jurisdiction on the basis of affidavits alone, to permit discovery, and to conduct an evidentiary hearing." Godino v. Cleanthes, 163 Vt. 237, 239, 656 A.2d 991, 992 (1995). If, as in this case, "a court chooses to rule on a motion to dismiss for lack of personal jurisdiction on the basis of affidavits alone, the party opposing [the] motion need make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction." Id. The nonmoving party's prima facie showing must go beyond the pleadings and rely upon specific facts set forth in the record. Schwartz v. Frankenhoff, 169 Vt. 287, 295, 733 A.2d 74, 81 (1999). "In assessing the submitted materials, the [trial] court eschews fact finding and simply accepts properly supported proffers of evidence as true and rules on the jurisdictional question as a matter of law." Id. (quotation omitted). "Our review of the trial court's legal analysis concerning personal jurisdiction is nondeferential and plenary." Fox v. Fox, 2014 VT 100, ¶ 9, 197 Vt. 466, 106 A.3d 919.

¶ 10.    "It is well settled that Vermont courts must have both statutory and constitutional power to exercise personal jurisdiction over a nonresident defendant." Id. Because "Vermont's long-arm statute, 12 V.S.A. § 913(b), permits state courts to exercise jurisdiction over nonresident defendants to the full extent permitted by the [federal] Due Process Clause," our

5

statutory and constitutional analyses are the same—the jurisdictional issue is resolved under federal constitutional law as interpreted by the U.S. Supreme Court. Id. (quotation omitted); see also N. Aircraft, Inc. v. Reed, 154 Vt. 36, 40-41, 572 A.2d 1382, 1385-86 (1990).

¶ 11. The crux of TPRI's argument on appeal is that recent controlling U.S. Supreme Court case law—specifically J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 1058, 131 S. Ct. 2780 (2011) and Walden v. Fiore, ___ U.S. ___, 134 S. Ct. 1115 (2014)—preclude Vermont courts from exercising personal jurisdiction over it in this case. According to TPRI, those cases stand for the propositions, respectively, that a defendant cannot be subjected to personal jurisdiction based on either the mere foreseeability that its product will end up in the subject forum or the unilateral conduct of third parties. We conclude that the governing law permits the exercise of personal jurisdiction in Vermont under the circumstances of this case.

¶ 12. A review of the U.S. Supreme Court case law on personal jurisdiction generally and the stream-of-commerce doctrine specifically reveals the following. "The Due Process Clause of the Fourteenth Amendment [to the United States Constitution] limits the power of a state court to render a valid personal judgment against a nonresident defendant." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980). "[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." Id. (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The concept of minimum contacts not only "protects the defendant against the burdens of litigating in a distant or inconvenient forum," but also "acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." World-Wide Volkswagen, 444 U.S. at 291.

¶ 13. "The limits imposed on state jurisdiction by the Due Process Clause . . . have been substantially relaxed over the years"—a "trend" that is "largely attributable to a fundamental

6

transformation in the American economy" resulting from an ever-increasing nationalization of commerce. Id. at 292-93; see also Dall v. Kaylor, 163 Vt. 274, 277, 658 A.2d 78, 80 (1995) ("As technology and economic practices diminish the importance of geographic boundaries, it is not unreasonable to anticipate the expansion of personal jurisdiction to those who deliberately transcend those boundaries in pursuit of economic gain."). Although " 'foreseeability' " alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause," it is not "wholly irrelevant." World-Wide Volkswagen, 444 U.S. at 295, 297. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State," but rather "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Id. at 297.

¶ 14. "A court may exercise either general or specific jurisdiction over a nonresident defendant." Fox, 2014 VT 100, ¶ 27. Although the State in this case also argues that there is general jurisdiction, which "applies to suits not arising out of or related to the defendant's contacts with the forum state," the principal focus of its argument is on specific jurisdiction, which requires that "a defendant has 'purposefully directed . . . activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.' " Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). Specific jurisdiction is satisfied when a defendant has "fair warning" that a particular activity may subject it to the jurisdiction of a state by virtue of the fact that the defendant "purposefully directed" its activities at residents of the forum state and that the litigation results from injuries arising out of or relating to those activities. Burger King, 471 U.S. at 472-73 (quotations omitted).

¶ 15. Therefore, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum

7

State." World-Wide Volkswagen, 444 U.S. at 297-98 (emphasis added). On the other hand, neither "random, fortuitous, or attenuated contacts," Burger King, 471 U.S. at 475 (quotations omitted), nor "the mere unilateral activity of those who claim some relationship with a nonresident can[] satisfy the requirement of contact with the forum State," World-Wide Volkswagen, 444 U.S at 298 (quotation omitted).

¶ 16. Since this stream-of-commerce doctrine was established in World-Wide Volkswagen, factions of the U.S. Supreme Court have at times set forth competing versions of the scope of the doctrine in plurality decisions. In Asahi Metal Indus. Co., Ltd. v. Super. Ct. of California, 480 U.S. 102 (1987), the only part of a products liability action arising from a motorcycle accident that remained when it reached the Court was an indemnity action by one of the foreign defendants, the maker of the motorcycle's tire and tube, against another foreign defendant, the maker of the tube's valve assembly. The question presented was whether the valve-assembly defendant's "mere awareness . . . that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes minimum contacts between the defendant and the forum State such that the exercise of jurisdiction" did not violate due process. Asahi, 480 U.S. at 105 (quotation omitted). Noting a disagreement among lower courts over the scope of the stream-of-commerce analysis set forth in World-Wide Volkswagen, the four-member plurality opinion stated that personal jurisdiction does not result from the mere placement of a product into the stream of commerce knowing that it may wind up in the forum state, but rather requires additional conduct by the defendant such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in a forum State." Id. at 112. In holding that imposing personal jurisdiction would be unreasonable and unfair, the

8

plurality opinion noted that the valve-assembly defendant "did not create, control, or employ the distribution system that brought its valves to California." Id. at 113.

¶ 17.    On the other hand, the four-member concurring opinion stated that, by requiring conduct beyond placing goods in the stream of commerce, the plurality opinion represented a minority view among the federal circuit courts and "a marked retreat from the analysis in World-Wide Volkswagen." Id. at 118 (Brennan, J., concurring).  According to the concurring justices, due process is satisfied as long as "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale," and the defendant, "as a participant in this process is aware that the final product is being marketed in the forum State." Id. at 117.

¶ 18.    The debate in the Supreme Court over the scope of World-Wide-Volkswagen's stream-of-commerce doctrine continued twenty-four years later in J. McIntyre Machinery, Ltd. v. Nicastro.  That case also involved a products liability action against a foreign manufacturer. The Court divided once again, issuing a four-justice plurality opinion, a two-justice concurring opinion, and a three-justice dissent.  The plurality opinion reversed a decision of the New Jersey Supreme Court concluding that the British manufacturer of scrap metal machines was subject to personal jurisdiction in New Jersey even though it had not advertised in, sent goods to, or otherwise particularly targeted the forum state.  McIntyre, 131 S. Ct. at 2785.  In so ruling, the plurality opinion noted and rejected the broader stream-of-commerce analysis in Justice Brennan's concurring opinion in Asahi.  Id. at 2788-89.

¶ 19.    The controlling concurring opinion, authored by Justice Breyer and joined by Justice Alito, concluded that the facts—(1) one machine sold on one occasion in New Jersey; (2) the manufacturer's desire to have its American distributor sell its machines to anyone in America willing to buy them; and (3) the manufacturer's attendance at trade shows in cities outside New Jersey—demonstrated neither a regular flow of its product, nor a regular course of sales in New

9

Jersey, nor something more such as special state-related designs or advertising. Id. at 2791-92 (Breyer, J., concurring). While joining the plurality's mandate, the concurring opinion cited both the plurality and concurring opinions in Asahi in support of its position. Id. at 2792. The three dissenters, relying heavily on World-Wide Volkswagen and Justice Brennan's concurrence in Asahi, included an appendix demonstrating that federal and state courts confronting facts similar to that case had "rightly rejected the conclusion that a manufacturer selling its products across the USA may evade jurisdiction in any and all States, including the State where its defective product is distributed and causes injury." Id. at 2801, 2804-06 (Ginsburg, J., dissenting). While not carrying the day in that case, the dissenters took "heart that the plurality opinion does not speak for the Court." Id. at 2804.

¶ 20.    Hence, World-Wide Volkswagen's stream-of-commerce analysis is the governing law on the stream-of-commerce doctrine, given the failure of the competing factions on the U.S. Supreme Court since that decision to garner a majority of votes to limit or expand the doctrine. "Because neither Justice Brennan's nor Justice O'Connor's test garnered a majority of the votes in Asahi, neither test prevailed as the applicable precedent." AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1362 (Fed. Cir. 2012). Moreover, "the crux of Justice Breyer's concurrence [in McIntyre] was that the Supreme Court's framework applying the stream-of-commerce theory—including the conflicting articulations of that theory in Asahi—had not changed, and that the defendant's activities in McIntyre failed to establish personal jurisdiction under any articulation of that theory." Id. at 1363; see McIntyre, 131 S. Ct. at 2792 (Breyer, J., concurring) (stating that, on record presented, "resolving this case requires no more than adhering to our precedents"). "Because McIntyre did not produce a majority opinion," courts "must follow the narrowest holding among the plurality opinions in that case," which is J. Breyer's determination "that the law remains the same after McIntyre." AFTG-TG, LCC, 689 F.3d at 1363; accord Ainsworth v. Moffett Eng., Ltd., 716 F.3d 174, 175 (5th Cir. 2013); see also

10

In re Chinese-Manufactured Drywall Prods. Liab. Litig., 753 F.3d 521, 541 (5th Cir. 2014) (stating that "the law remains the same after McIntyre, and that circuit courts may continue to attempt to reconcile the Supreme Court's competing articulations of the stream of commerce test").

¶ 21.    Accordingly, we reject TPRI's argument that both the plurality and concurring opinions in McIntyre preclude the exercise of personal jurisdiction over a defendant based solely on the defendant's introduction of its product into a national distribution system aimed at bringing the product into the forum state among others.  Indeed, as noted, the fundamental principle articulated in World-Wide Volkswagen is that although neither random nor fortuitous acts can create personal jurisdiction, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."  444 U.S. at 297-98; cf. Hedges v. W. Auto Supply Co., 161 Vt. 614, 614-15, 640 A.2d 536, 537 (1994) (stating that, even absent evidence that product was sold in Vermont, defendant's sale of product to distributor for national marketing, including in Vermont, was sufficient to establish personal jurisdiction over defendant); Pasquale v. Genovese, 136 Vt. 417, 421, 392 A.2d 395, 398 (1978) (mem.) (finding personal jurisdiction based "upon the defendant's active, planned participation in the Vermont market, through a chain of manufacture and distribution set up for the purpose, and through eventual sale of the [product] in Vermont").

¶ 22.    This principle was applied by the United States District Court for the Southern District of New York in two 2005 cases involving facts similar to the instant case.  The cases concerned lawsuits in which dozens of municipalities and related entities filed actions against hundreds of companies in the petroleum industry, alleging that the companies caused or threatened the contamination of groundwater with the introduction of MTBE.  Specifically, the cases addressed the motions of particular defendants seeking to dismiss the lawsuits for lack of

11

personal jurisdiction. In the first case, the court reviewed the two competing opinions in <u>Asahi</u> construing the scope of the stream-of-commerce doctrine, but noted that neither constituted binding decisions and that the holding and reasoning in <u>World-Wide Volkswagen</u> remained the controlling law. <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, Master File No. 1:00-1898, MDL No. 1358(SAS), No. M21-88, 2005 WL 106936, at *7-8 (S.D.N.Y. Jan. 18, 2005). Citing the regular and anticipated flow of the defendant's product into the stream of commerce, the court found personal jurisdiction was warranted in the forum states because the defendant manufacturer of MTBE had created a national market for its product and had sold it to refiners, traders, and blenders who incorporated it into their gasoline. <u>Id</u>. at *9. The court reached the same conclusion with two other defendants in the second case, stating that one defendant had "supplie[d] MTBE-containing gasoline to the national market" and thus reasonably should have expected "its product to reach all of the states in the nation," and that the other defendant had produced MTBE in Texas that reached the forum states through "sales to other refiners with nationwide distribution." See <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, 399 F. Supp. 2d 325, 332-33 (S.D.N.Y. 2005).

¶ 23. Based on similar reasoning, given the facts of this case as they have been developed thus far, we conclude that the superior court did not err in denying TPRI's motion to dismiss for lack of personal jurisdiction. In its complaint, the State alleged that TPRI was one of twenty-nine companies that refined, marketed, or otherwise supplied, directly or indirectly, MTBE or gasoline containing MTBE—a fungible product commingled during transport—into a nationwide distribution system that they knew or should have known would bring their product into Vermont. Further, the affidavit of the State's expert in support of its opposition to TPRI's motion to dismiss explained that gasoline is a fungible product commingled in pipelines to various distribution centers, including to a distribution center in New Jersey, from which gasoline is trucked throughout New England, including Vermont. The expert also opined that

companies such as TPRI that supply MBTE-gasoline to the East Coast distribution system do so with the understanding that the fungible gasoline they supplied through this system was likely to eventually end up in the Northeast, including Vermont. Rather than contest these allegations, TPRI opposed the State's request for discovery to prove the allegations, which describe activities resulting in a regular and anticipated, rather than a random or fortuitous, introduction of TPRI's products into Vermont. The State's complaint and accompanying affidavit are sufficient for the superior court to exercise specific personal jurisdiction over TPRI.

¶ 24. TPRI argues that, instead of relying upon the 2005 decisions of the United States District Court for the Southern District of New York, we should rely upon that same court's 2014 decision in which the court granted the defendant's motion to dismiss, for lack of personal jurisdiction in the Commonwealth of Puerto Rico, a complaint alleging injuries resulting from the defendant's use and handling of MTBE. See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., Master File No. 1:00-1898, MDL No. 1358 (SAS), No. M21-88, 2014 WL 1778984 (S.D.N.Y. May 5, 2014). The defendant in the Puerto Rico case was a Texas-based marketer of energy products who had sold MTBE to an oil company in Oklahoma "in a series of spot sales." Id. at *1. In its brief analysis, the court granted the defendant's motion to dismiss based on the following findings and conclusions: (1) the purchasing oil company's independent decision to ship the MTBE to Puerto Rico did not establish jurisdiction over the defendant because it was not foreseeable, and in any case foreseeability alone does not establish jurisdiction; (2) no evidence showed that the defendant knew, or had any way of knowing, that its MTBE was blended into gasoline destined for Puerto Rico; and (3) jurisdiction could not be based on the actions of the defendant's subsidiary company. Id. at *3-4.

¶ 25. TPRI contends that this Court should rely on this latter case—which was decided after the U.S. Supreme Court's decisions in McIntyre and Walden—rather than the outdated cases decided in 2005 before those Supreme Court cases issued. The State responds to this

argument by attempting to distinguish the 2014 case, noting that it involved "spot sales" to the island territory of Puerto Rico, and thus the court did not consider the defendant's distribution of its product through a national distribution system.

¶ 26.   We decline TPRI's invitation to rely upon the Puerto Rico case.  First, we note that the brief decision did not rely upon or even cite McInytre, presumably because it recognized, as we have here, that McIntyre did not alter previous controlling law on the stream-of-commerce doctrine.  Second, although the court cited Walden v. Fiore, ___ U.S. ___, 134 S. Ct. 1115, 1122 (2014), for the proposition that personal jurisdiction may be established only by the defendant's—and not a third party's—contacts with the forum state, that proposition was not introduced in Walden, but rather was well established and in fact stated in World-Wide Volkswagen—the very case that introduced the stream-of-commerce doctrine.  See 444 U.S. at 298 ("[T]he mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958))).  Walden is not a stream-of-commerce case and offers little, if anything, to the analysis here.  In the end, we do not find the Puerto Rico case persuasive to the extent that it diverges from the 2005 cases and our analysis above.  We uphold the superior court's exercise of personal jurisdiction over TPRI based upon the company's own conduct and contacts with Vermont via the nationwide gasoline distribution system—pursuant to the stream-of-commerce doctrine—not the conduct or contacts of independent third parties.

¶ 27.   Finally, TPRI argues that asserting jurisdiction over it would violate traditional notions of fair play and substantial justice.  We disagree.  "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice."  Burger King, 471 U.S. at 476 (quotation omitted); see N. Aircraft, 154 Vt. at 42, 572 A.2d at 1386 (same).  Those factors include "the

14

burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King Corp., 471 U.S. at 477 (quotations omitted). "[W]here a defendant who purposefully has directed [its] activities at forum residents seeks to defeat jurisdiction, [it] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. Thus, "dismissals resulting from the application of the reasonableness test should be few and far between." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 575 (2d Cir. 1996).

¶ 28. Here, TPRI argues that because it is headquartered in Texas and has no presence in Vermont, the State's interest in protecting its groundwater, while legitimate, "cannot overcome TPRI's lack of minimum contacts with Vermont." Essentially, TPRI is still warring with the superior court's finding of minimum contacts, which we have upheld. This argument falls far short of making a compelling case that it is unreasonable to force the company to litigate in Vermont the State's contention that TPRI's product contaminated state waters.

Affirmed.

FOR THE COURT:

_____

Chief Justice

15