Filed 12/11/24

VERMONT SUPERIOR COURT

Chittenden Unit

175 Main Street

Burlington VT 05402

802-863-3467

www.vermontjudiciary.org



CIVIL DIVISION

Case No. 21-CV-02778

| | |
|---|---|
| STATE OF VERMONT,<br>    Plaintiff<br><br>v.<br><br>EXXON MOBIL CORPORATION, et al.,<br>    Defendants | DECISION ON MOTIONS |

### RULING ON DEFENDANTS' MOTIONS TO DISMISS

The State brings this action against the gas/oil companies Exxon Mobil, Shell, Sunoco, Citgo, and some of their related entities, asserting violations of the Vermont Consumer Protection Act, 9 V.S.A. § 2453, et seq. Broadly, the State alleges that Defendants have known for decades that Vermont consumers' use of their fossil fuel products would cause harmful climate change, yet they actively misrepresented and concealed this information in marketing, distributing, and selling their products to Vermont consumers. The State claims that Defendants have engaged in unfair and deceptive acts or practices in commerce under the Act. Pursuant to Rules 12(b)(2) and 12(b)(6) of the Vermont Rules of Civil Procedure, Defendants have filed motions to dismiss for lack of personal jurisdiction and for failure to state a claim. The Court heard oral argument on November 6, 2024. For reasons discussed below, Defendant's motions are DENIED.

### Summary of Factual Allegations

For purposes of deciding the instant motions, the Court accepts the following facts alleged in the Complaint as true. The Court makes no finding as to their accuracy.[1]

By the 1980s, Defendants – through their own internal studies as well as their membership and participation in the American Petroleum Institute ("API"), an industry trade group – knew that the fossil fuels they sold were substantially contributing to climate change and that the potential resulting environmental damage could be severe. Compl. ¶¶ 42-66. Despite this knowledge, Defendants misled Vermont consumers in their purchasing decisions for decades by misrepresenting to and concealing from them the connection between Defendants' fossil fuel products and climate change. Id. ¶ 69. The Complaint organizes Defendants' alleged deceptive

---

[1] See Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 10, 209 Vt. 514 ("On a motion to dismiss, the court must assume that the facts pleaded in the complaint are true and make all reasonable inferences in the plaintiff's favor.").

conduct into three broad categories: (1) climate science denial; (2) marketing of specific products as climate-friendly; and (3) "greenwashing."

A.     Climate Science Denial.

Defendants' alleged "deceptive campaign of climate science denial" included advertisements designed to raise doubts about the science of climate change and which were contradicted by Defendants' own scientists. *Id*. ¶ 71.  For example:

- A 1988 internal memo stated that Exxon would emphasize uncertainty in scientific conclusions regarding the greenhouse effect. *Id*. ¶ 72.

- Shell prepared a 1994 report "falsely emphasizing scientific uncertainty about climate change and its causes." *Id*. ¶ 73.

- API published a 1996 report on behalf of its members "false[ly]" stating that "[f]acts don't support the arguments for restraining oil use." *Id*. ¶ 75.

- Mobil (a predecessor of Exxon) paid for a series of "advertorials" that sought to undermine arguments for reducing greenhouse gas emissions.  These "advertorials" were meant to look like editorials rather than paid advertisements, and were placed in newspapers such as The New York Times, with significant readership in Vermont. *Id*. ¶ 88.  They appeared in 1997, 2000, and 2004, and misled consumers by questioning global warming and the role of emissions, even though Exxon knew that the science behind both was accurate. *Id*. ¶¶ 89-93.

- In 2001, Citgo's website called into question the existence of climate change and, in 2002 and for several years thereafter, described the "global warming issue" as "amazingly complex," the science "controversial," and the computer modeling "questionable." *Id*. ¶ 94.

"Defendants intended their campaigns of disinformation about fossil fuels and climate change to reach consumers in Vermont, and they did."  Compl. ¶ 95.

B.     Marketing of Specific Products as "Climate Friendly".

Defendants continue to mislead Vermont consumers through their marketing of specific products as "climate friendly." *Id*. ¶ 96.  They use terminology such as "green," "clean," "cleaner," "purer," and "lower emissions" without disclosure of the key role that Defendants' fossil fuel products play in causing climate change and the fact that their products remain a leading cause of global warming. *Id*. ¶ 97-98.  For example:

- In 2016, Exxon marketed its new "Synergy™" fuel as "engineered" for "lower emissions," but did not disclose in its promotional material that the reduction in carbon dioxide emissions is "very small," any improvement in emissions "very limited," and that its "Synergy™" fuel remained a significant contributor to climate change.  Compl. ¶¶ 100-01.

- In 2015, Shell promoted its new "V-Power Nitro+ Premium" fuel as "more efficient" with "lower emissions" and "seven times the cleaning agents required," but did not disclose that the difference in emissions was "very small" and that this product "still contribute[s] significantly to climate change." *Id*. ¶ 107-08.

- Sunoco introduced its new "Sunoco UltraTech" fuel formula in 2017, and marketed it as helping cars to run "cleaner, longer, and more efficiently," and "ensure compliance with tighter vehicle emissions . . . requirements" while not disclosing the "enormous amounts of greenhouse gas emissions associated with its products and the very limited impact of any 'lower emissions' benefit." *Id*. ¶¶ 115-16.

- Citgo markets its "TriCLEAN" gasoline as "having environmental benefits" and states that it "'[c]leans' . . . engine parts," and "lowers emissions," but does not mention the "massive" greenhouse gas emissions associated with its fossil fuel products and the "very limited impact" of any emission-lowering benefit. *Id*. ¶ 117.

- Defendants have advertised these fuel products on television, radio, digital/social media, print, on its trucks, and at Vermont gas stations. Compl. ¶¶ 100, 102-06, 108, 114. According to the State, even assuming that these fuel products improve engine performance or efficiency relative to earlier or other fuel products, Defendants' ads "convey a false impression that the use of their products results in environmental benefits." *Id*. ¶ 118.

C.    "Greenwashing".

Defendants also continue to mislead Vermont consumers by engaging in "greenwashing," which the State defines as "public relations and marketing tactics designed to make a company or product appear environmentally friendly even though it has little or no meaningful impact on harm reduction, while distracting the public from the environmental damage caused by the company's activities." Compl. ¶ 119. Defendants have spent millions of dollars in advertising and promotions on various outlets to portray themselves as environmentally responsible to Vermont consumers. *Id*. ¶ 120-21. For example:

- Exxon has run ads in the print and digital editions of The New York Times "bragging about its efforts to develop biofuels," which do not reveal the "miniscule scale" of these efforts compared to its continued investment in fossil fuels. Compl. ¶ 122.

- Shell "saturat[es] its brand" with "green" images portraying Shell as a "good environmental caretaker," which "contradict[s]" the "actual environmental and climate impacts of Shell's fossil fuel products." *Id*. ¶ 130.

- Shell's ads give the "false impression that renewable and low-carbon energy is an extensive part of its business," but does not disclose that those investments are "negligible" compared to the amounts it spends on fossil fuels. *Id*. ¶ 133.

- Sunoco's website continues to state that "Environmental stewardship is a priority for our company," even though it "does very little to protect the environment and prevent or mitigate climate change" and "remains focused on selling fossil fuels." *Id*. ¶ 156.

3

- Citgo told consumers in a social media ad that buying its gasoline would help communities suffering from natural disasters "while making no mention that fossil fuel use makes such disasters *more likely to happen*." *Id.* ¶ 159 (emphasis in Complaint).

- Citgo has used social media to associate itself with cleaner energy, such as wind power. *Id.* ¶ 160.

Additionally, API, on behalf of its members "and with their knowledge and financial and other support," has facilitated these greenwashing campaigns through Super Bowls ads, Washington Post ads, and promotional campaigns on various other outlets. Compl. ¶ 163-69.

According to the Complaint, these alleged deceptive practices concern matters material to the purchasing decisions of Vermont consumers. The State cites polling data indicating that information about fossil fuel climate impacts is material to most consumers. Furthermore, Vermont consumers tend to be more ecologically minded than most, and thus are likely to reduce their fossil fuel purchases in response to fair and honest disclosures of Defendants' fossil fuel products. Compl. ¶¶ 170-75.

The State asserts two causes of action under the Consumer Protection Act: one for deceptive acts and practices, and one for unfair business practices. The relief the State requests includes: (1) a permanent injunction prohibiting Defendants from engaging in unfair or deceptive acts and practices and requiring them to rectify their prior and ongoing objectionable conduct by disclosing the truth about the role of fossil fuels in climate change at every point of sale in the State; (2) a judgment for the disgorgement of the money Defendants unlawfully acquired and/or retained; (3) statutory civil penalties, consisting of a separate $10,000 penalty for each violation of the Act; and (4) an award of costs and fees.

Discussion

All Defendants have moved to dismiss for failure to state a claim, and some have moved to dismiss for lack of personal jurisdiction. They assert that claims based on statements made more than six years prior to the Complaint's filing are barred by the statute of limitations; that their alleged misconduct did not occur "in commerce" as the Consumer Protection Act requires; that their statements were opinions rather than actionable statements of fact; that some statements about which the State complains were factually true and, thus, not actionable; that the statements were not material and were not likely to affect a consumer's decision to purchase their products; that statements made by the non-party trade organization API are not attributable to Defendants; and that Defendants' speech is constitutionally protected by the First Amendment. They also contend that their statements and alleged misstatements are protected by the *Noerr-Pennington* doctrine, which protects lobbying activity, and that the relief sought violates the Commerce Clause because the State seeks to control Defendants' conduct beyond the boundaries of the State. Defendants further contend that they are not subject to personal jurisdiction under Vermont's long-arm statute.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts consider whether "it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." *Davis v. Am. Legion, Dep't of Vermont*, 2014 VT 134, ¶ 12, 198 Vt. 204 (quoting *Alger v.*

4

*Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309). The Court "must assume that the facts pleaded in the complaint are true and make all reasonable inferences in the plaintiff's favor." *Montague*, 2019 VT 16, ¶ 10; *see also Alger*, 2006 VT 115, ¶ 12 ("[W]e assume that the movant's contravening assertions are false."). The burden on plaintiffs under Vermont law is "exceedingly low" at the pleading stage. *Prive v. Vermont Asbestos Group*, 2010 VT 2, ¶ 14, 187 Vt. 280. Motions to dismiss for failure to state a claim are thus "disfavored and should be rarely granted." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575. Complaints are intended to give enough notice to the defendant to allow a response, but need not lay out every detail of the facts supporting the claim. *See Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 13, 184 Vt. 1 ("The complaint is a bare bones statement that merely provides the defendant with notice of the claims against it."). The goal is to "strike a fair balance, at the early stages of litigation, between encouraging valid, but as yet underdeveloped causes of action and discouraging baseless or legally insufficient ones." *Id*.

I.      Personal Jurisdiction.

Exxon, Motiva, and some of the Sunoco defendants (specifically: (1) Sunoco LP; (2) ETC Sunoco Holdings LLC; and (3) Energy Transfer LP) contend that they are not subject to personal jurisdiction under Vermont's long-arm statute. "Vermont's long-arm statue, 12 V.S.A. § 913(b), permits state courts to exercise jurisdiction over nonresident defendants 'to the full extent permitted by the Due Process Clause' of the U.S. Constitution." *Fox v. Fox*, 2014 VT 100, ¶ 9, 197 Vt. 466 (quoting *N. Aircraft, Inc. v. Reed*, 154 Vt. 36, 40, 572 A.2d 1382, 1385 (1990)). There are two essential prongs to the personal jurisdiction inquiry: whether the defendant has "minimum contacts" with the state, and whether it is fair and reasonable to subject him or her to suit in this jurisdiction. Some cases break this down, and some discuss the issues as part of a single inquiry. The overall question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *N. Aircraft*, 154 Vt. at 41, 572 A.2d at 1385 (quotation omitted). "This reasonableness requirement is met when the defendant purposefully directs activity toward residents of a forum state and the litigation arises out of, or relates to, that activity. The reasonableness requirement also prevents a defendant from being subjected to jurisdiction on the basis of fortuitous, attenuated, or random contacts." *Dall v. Kaylor*, 163 Vt. 274, 276, 658 A.2d 78, 79 (1995) (citations omitted).

"Personal jurisdiction must be proved independently as to each defendant." *N. Sec. Ins. Co. v. Mitec Elecs., Ltd.*, 2008 VT 96, ¶ 15, 184 Vt. 303 (citing *Schwartz v. Frankenhoff,* 169 Vt. 287, 294, 733 A.2d 74, 80 (1999)). Yet, the State's burden here is "relatively slight." *Godino v. Cleanthes*, 163 Vt. 237, 239, 656 A.2d 991, 992 (1995). "If a court chooses to rule on a motion to dismiss for lack of personal jurisdiction on the basis of affidavits alone, the party opposing a motion need make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction," *id*. (citation omitted), and the court "must consider the pleadings and affidavits in a light most favorable to the plaintiff," *N. Sec. Ins.*, 2008 VT 96, ¶ 15 (quotation omitted); *see also State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 9, 201 Vt. 342 ("In assessing the submitted materials, the trial court eschews fact finding and simply accepts properly supported proffers of evidence as true and rules on the jurisdictional question as a matter of law." (quotation omitted)).

5

Here, the pleadings and other materials proffered by the State are sufficient to demonstrate a prima facie case of personal jurisdiction against each Defendant. While "neither random nor fortuitous acts can create personal jurisdiction, 'the forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.'" *Atl. Richfield Co.*, 2016 VT 22, ¶ 21 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)); *see also Pasquale v. Genovese*, 136 Vt. 417, 421, 392 A.2d 395, 398 (1978) ("We base our holding of jurisdiction here upon the defendant's active, planned participation in the Vermont market, through a chain of manufacture and distribution set up for the purpose, and through eventual sale of the vehicle in question in Vermont.").

As alleged in the Complaint, Motiva "distributes Shell-branded products in the eastern and southern United States" –an area that includes Vermont – and has been registered in Vermont as a foreign LLC engaged in "marketing and distribution activities" in the state since 1998. Compl. ¶ 17; Vt. Secretary of State Business Information (Buckwalter Decl., Ex. 9). The Sunoco Defendants "direct and control the branding, marketing, sales, promotions, development, signage, advertising, and sale of their branded fossil fuels at their respectively branded gas stations in Vermont, including point-of-sale advertising and marketing." Compl. ¶ 30; *see also id*. ¶ 38. Exxon indirectly distributed Exxon-branded fuel in Vermont and promoted that brand to Vermont consumers through Vermont gas stations and websites. Compl. ¶¶ 31-32, 36. Even assuming there is no direct physical contact with Vermont, advertising one's products in Vermont is enough. After all, "[i]t is hardly unfair for defendants to defend themselves in jurisdictions where they choose to advertise their products." *Dall*, 163 Vt. at 276-77, 658 A.2d 79-80 (defendants advertised their horses "in a national market that included Vermont"); *see also Brown v. Cal Dykstra Equip. Co.*, 169 Vt. 636, 636-37, 740 A.2d 793, 794-95 (1999) (mem.) (holding that Vermont courts had personal jurisdiction over Wisconsin-based heavy equipment seller through advertisement in national magazine).

Motiva contends that the State cannot establish personal jurisdiction because its allegations and evidence regarding Motiva's contacts with Vermont are insufficiently conclusory and are not related to the claims in the Complaint. In support of its position, Motiva relies on *Schwartz v. Frankenhoff*, 169 Vt. at 295-96, 733 A.2d at 80-81, where the Court affirmed the lower court's dismissal of fraud-based claims against out-of-state parties because the alleged conspiracy rested on conclusory allegations that failed to establish prima facie case of personal jurisdiction. However, the contacts alleged here are more than merely conclusory. "Motiva refines petroleum products at three refineries and markets gasoline, diesel and other petroleum products in 26 states and the District of Columbia through a network of more than 8,200 Shell-branded gas stations as well as unbranded wholesalers." *See* Buckwalter Decl., Ex. 3. "Motiva's operating territory includes . . . Vermont." *Id*. While Motiva contends that the news article filed as Exhibit 3 is irrelevant because it discusses a deal between Motiva and Phillips 66 to sell "76 brand" gasoline, which the Complaint does not reference, *see* Motiva's Reply at 4, the article refers to other products that Motiva marketed as well. *See id*. ("In addition to marketing under the 76 brand, the company will continue to market products under the Shell brand."). Moreover, Motiva's marketing of Shell products in Vermont plainly relates to the claims in the Complaint, which allege deceptive marketing of Shell products. *See* Compl. ¶¶ 106-13; *see also City &*

6

*Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1189 (Haw. 2023) ("Plaintiffs' allegations that Defendants misled consumers about the dangers of using their products 'arise out of' and 'relate to' Defendants' contacts with Hawai'i, here Defendants' sale and promotion of oil and gas in Hawai'i").[2]

Three of the Sunoco Defendants (Sunoco LP; ETC Sunoco Holdings LLC; and Energy Transfer LP) contend that the State's basis for personal jurisdiction against them impermissibly relies on mere ownership of the other Sunoco entities (Sunoco LLC and Energy Transfer (R&M) LLC). The Court disagrees. The State has offered evidence that ETC Sunoco Holdings LLC is a successor entity to Sunoco Inc., and that Sunoco Inc. was a wholesale and retail fuel distributor with 5,000 branded sites along the East Coast and engaged in deceptive greenwashing on its pre-2012 website. *See* Buckwalter Decl., Exs. 10, 11, & 18. "[V]arious courts have held that when a person is found to be a successor in interest, the court gains personal jurisdiction over them simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state." *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999); *see also State v. Monsanto Co.*, No. 23-CV-2606, 2024 WL 2818695, at *4 (Vt. Super. Ct. May 29, 2024) (Toor, J.) (discussing the "established doctrine of successor liability").

In addition, there is evidence that Sunoco LP, formerly known as "Susser Petroleum Partners LP," has adopted the Sunoco name to take advantage of the established Sunoco brand, is the exclusive wholesale supplier of Sunoco-branded fossil fuel, and operates and controls the "sunoco.com" website, which identifies Vermont stations selling Sunoco-branded gasoline. *See* Buckwalter Decl., Exs. 12 at S-4, 13 at 6, and 15. As for Energy Transfer LP, its "retail marketing and wholesale distribution operations" consist of the retail sale and distribution of branded and unbranded motor fuel to independently operated retail sites and other customers, and it apparently controls Sunoco LP and caused Susser Petroleum to change its name to Sunoco LP. Buckwalter Decl., Exs. 12, 16. While a factual dispute may remain as to whether personal jurisdiction exists as to some of the Sunoco Defendants, the State has "demonstrate[d] facts which would support a finding of jurisdiction," and the Court must accept those facts as true as this stage of the case. *Godino*, 163 Vt. at 239, 656 A.2d at 992; *see also Atl. Richfield, Co.*, 2016 VT 22, ¶ 9.

---

[2] Motiva also argues that the Court cannot consider Ex. 3 because the Buckwalter Declaration – cited by the State to support the use of its nine exhibits – does not attest to any personal knowledge of the contents of those exhibits. Motiva's Reply at 2. While Motiva's argument might have some force at the summary judgment stage, it is inapposite here, where the issue is personal jurisdiction at the pleading stage. "Where no evidentiary hearing is held on the jurisdictional issue, the Court must consider the pleadings and affidavits in a light most favorable to the plaintiff." *N. Sec. Ins. Co.*, 2008 VT 96, ¶ 15 (quotation omitted). The State's materials are enough to "demonstrate facts which would support a finding of jurisdiction" at this early stage of the case. *Id.*; *see also Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (plaintiff "must, by affidavit or *otherwise*, set forth specific facts showing that the court has jurisdiction" (emphasis added)). In any event, Motiva has not submitted any evidence of its own to support its argument that personal jurisdiction is lacking, so the Court is left with the State's allegations and evidence.

Exxon appears to acknowledge that personal jurisdiction is proper under Vermont precedent, but argues that those cases were wrongly decided and conflict with binding U.S. Supreme Court precedent. Exxon's Opp'n at 34 (citing *Atl. Richfield Co.*, 2016 VT 22; *Cal Dykstra Equip. Co.*, 169 Vt. 636; *Dall*, 163 Vt. 274). As the Court noted during oral argument, such a contention is better raised on appeal to the Vermont Supreme Court than to this Court.

Accordingly, Defendants' motions to dismiss for lack of personal jurisdiction are denied.

## II. Statute of Limitations.

Defendants next contend that the action is time-barred to the extent it relies on statements and actions prior to September 14, 2015 (that is, six years before the Complaint was filed). *See* 12 V.S.A. § 511. In the statute of limitations context, the date of discovery of the injury rather than the date of the injury itself is the controlling factor. "A cause of action accrues when the plaintiff discovers, or should have discovered, both the injury and its cause." *Estate of Alden v. Dee*, 2011 VT 64, ¶ 20, 190 Vt. 401 (citing *Pike v. Chuck's Willoughby Pub, Inc.*, 2006 VT 54, ¶ 14, 180 Vt. 25; *Univ. of Vermont v. W.R. Grace & Co.*, 152 Vt. 287, 289-90, 565 A.2d 1354, 1356-57 (1989)). Specifically, the claim accrues:

> upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery. Thus, the statute of limitation begins to run when the plaintiff has notice of information that would put a reasonable person on inquiry, and the plaintiff is ultimately chargeable with notice of all the facts that could have been obtained by the exercise of reasonable diligence in prosecuting the inquiry.

*Estate of Alden*, 2011 VT 64, ¶ 20 (citing *Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 7, 186 Vt. 605 (mem.)); *see also Turner v. Roman Catholic Diocese of Burlington*, 2009 VT 101, ¶ 50, 186 Vt. 396 (applying "discovery rule" standard). "Determination of the date of accrual under the discovery rule is a factual issue that generally should be decided by the jury." *Pike*, 2006 VT 54, ¶ 18 (citing *Lillicrap v. Martin*, 156 Vt. 165, 172, 591 A.2d 41, 44 (1989)).

Defendants argue that their alleged decades-old climate science disinformation campaign falls well outside the statute of limitations. They contend that the State (or Vermont consumers) should have known about the link between fossil fuel emissions and climate change by 2003 at the latest, when the State sued the EPA seeking to compel the Agency to regulate greenhouse gas emissions. But as the State emphasized during argument, the instant action is not based on the link between fossil fuel emissions and climate change; rather, it rests on Defendants' alleged deceptive acts to misrepresent and conceal that link that were contrary to Defendants' own undisclosed studies.

Defendants point to earlier lawsuits brought against fossil fuel companies, including the 2008 complaint in *Native Village of Kivalina* v. *ExxonMobil Corp.*, No. 4:08-cv-01138 (N.D. Cal. Feb. 26, 2008), Dkt. 1 ¶¶ 189-248, 269-77 (Exxon's Ex. G) and the 2011 complaint in *Comer* v. *Murphy Oil USA, Inc.*, No. 1:11-cv-00220-LG-RHW (S.D. Miss. May 27, 2011), Dkt.

¶ 41 (Exxon's Ex. H). However, the *Comer* complaint claims nuisance, trespass, and negligence and makes no allegations of deceptive conduct aside from a passing reference to an "illegal conspiracy to prevent dissemination of scientific information regarding the specific hazards created by Global Warming." *Comer* Compl. ¶ 41. The *Kivalina* complaint does allege a "long campaign by power, coal, and oil companies to mislead the public about the science of global warming" as part of a civil conspiracy claim. *Kivalina* Compl. ¶ 189. But the Court cannot determine as a matter of law at the pleadings stage that the *Kivalina* complaint, brought in federal district court in Northern California, definitively put Vermont consumers on inquiry notice of Defendants' alleged deceptive conduct such that the limitations period for any potential claims began to run in 2008.

Defendants also rely on trial court decisions from Delaware and Maryland that dismissed similar claims against fossil fuel companies on statute of limitations grounds. The Court does not find such cases persuasive. Those courts concluded, with very little discussion or analysis, that the plaintiffs and/or general public were aware of the defendants' alleged misleading statements, or had access to information as to the disputes regarding the existence and effects of climate change, years before the cases were filed. *See State ex rel. Jennings v. BP Am. Inc.*, No. N20C-09-097 MMJ CCLD, 2024 WL 98888, at *19 (Del. Super. Ct. Jan. 9, 2024); *Mayor and City Council of Baltimore v. BP P.L.C.*, No. 24-C-18-004219, 2024 WL 3678699, at *15 (Md. Cir. Ct. July 10, 2024). For example, the Delaware court referenced the "highly-publicized *Kivalina* lawsuit" as well as news reports in The New York Times and The Washington Post that "warned the public about global warming and the deception used by oil and coal industries." *Jennings*, 2024 WL 98888, at *19. But as the Court has discussed above, the public's knowledge about certain news reports and the *Kivalina* complaint are matters of fact to be decided on summary judgment or at trial. Moreover, in dismissing the claim, the Maryland court noted that "[t]he question of when an action accrues is a question of law to be determined by the judge," *Baltimore*, 2024 WL 3678699, at *15 – which again, is an assertion entirely at odds with settled Vermont law. *See Agency of Nat. Res. v. Towns*, 168 Vt. 449, 454, 724 A.2d 1022, 1025 (1998) ("[T]he determination of the accrual date of a claim is generally a question reserved for the trier of fact."); *Abajian v. TruexCullins, Inc.*, 2017 VT 74, ¶ 14, 205 Vt. 331 (same). Thus, the Court declines to follow the examples of the Delaware and Maryland trial courts.

For the foregoing reasons, Defendants' motions to dismiss on statute of limitation grounds are denied.[3]

III.     Vermont Consumer Protection Act.

The Consumer Protection Act prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). The Act contains a public enforcement mechanism:

> Whenever the Attorney General . . . has reason to believe that any person is using
> or is about to use any method, act, or practice declared by section 2453 of this title

---

[3] To be clear, even if Defendants' statute of limitations argument had any teeth, it would apply only to the alleged pre-2015 acts. It would not foreclose the product-specific and greenwashing allegations, which are alleged to have occurred since 2015.

9

to be unlawful, . . . and that proceedings would be in the public interest, the Attorney General . . . may bring an action in the name of the State against such person to restrain by temporary or permanent injunction the use of such method, act, or practice . . . .

9 V.S.A. § 2458(a).

As described above, the State alleges three broad categories of unfair or deceptive acts and practices: (1) climate science disinformation campaigns (Compl. ¶¶ 67-95); (2) deceptive marketing of specific products (Compl. ¶¶ 96-118); and (3) "greenwashing" campaigns (Compl. ¶¶ 119-69). Defendants argue that the alleged deceptive acts (particularly the climate science disinformation and greenwashing campaigns) did not take place in the "consumer marketplace" and are thus non-actionable. They further contend that the alleged acts are not deceptive because they are not false, constitute commercial puffery, and are not material. Defendants also assert that actions taken by the trade organization API cannot be attributed to them. As to the claim of "unfair" acts and practices, Defendants contend that it fails for the same reasons as the deception claim.[4]

### A. "In commerce" requirement.

The alleged deceptive acts need not have occurred in the context of a specific consumer transaction, particularly with an action brought by the Attorney General. "Nowhere does the statute expressly limit the terms 'unfair or deceptive acts or practices in commerce' to transactions between businesses and consumers." *State v. Int'l Collection Serv., Inc.*, 156 Vt. 540, 541, 594 A.2d 426, 427 (1991). As the Vermont Supreme Court has explained:

Under the plain wording of the section, the Attorney General is authorized to bring an action on behalf of aggrieved victims when (1) he has reason to believe that any person is using or is about to use any method, act or practice declared unlawful, and (2) such an action would be in the public interest. There are no other express limitations on the types of activities against which the attorney general may take action.

*Id*. at 542, 594 A.2d at 427-28; *see also State of Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 WL 3741424, at *7 (Vt. Super. Ct. July 29, 2024) (Toor, J.) (noting that the statute "has different requirements for cases brought by individuals and those brought by the State" and has "no requirement of a specific purchase and sale in such cases" brought by the State).

---

[4] Motiva also argues separately that there are no allegations that it directly participated in deceptive conduct, that the State unfairly lumps it in with Shell, and that derivative liability is not available under the Consumer Protection Act. *See* Motiva's Mot. to Dismiss at 4-7. However, the State is not seeking derivative liability. Rather, the State alleges that Motiva "markets and distributes Shell-branded products in the eastern . . . United States," Compl. ¶ 17, and that Shell products were deceptively marketed, Compl. ¶¶ 106-13. Assuming the truth of these allegations and drawing all reasonable inferences in the State's favor, *see Montague*, 2019 VT 16, ¶ 10, this is sufficient at the pleading stage to state a Consumer Protection Act claim against Motiva.

10

Defendants rely heavily on *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 19, 195 Vt. 524, to support their argument that the State's allegations here do not meet the "in commerce" requirement. They note that the statute authorizes Attorney General actions only regarding acts or practices "declared by section 2453 of this title to be unlawful." Section 2453, of course, prohibits "unfair or deceptive acts or practices in commerce." And the *Foti Fuels* Court held that "the 'in commerce' requirement narrows the [Act's] application to prohibit only unfair or deceptive acts or practices that occur in the consumer marketplace." *Foti Fuels*, 2013 VT 111, ¶ 21. The Court further explained:

> To be considered "in commerce," the transaction must take place in the context of an ongoing business in which the defendant holds himself out to the public. Further, the practice must have a potential harmful effect on the consuming public, and thus constitute a breach of a duty owed to consumers in general. By contrast, transactions resulting not from the conduct of any trade or business but rather from private negotiations between two individual parties who have countervailing rights and liabilities established under common law principles of contract, tort and property law remain beyond the purview of the statute.

*Id*. (citations and quotations omitted).

*Foti Fuels* does not require dismissal of this action. To start, that case did not involve an action brought by the Attorney General. Rather, it was a lawsuit stemming from "private negotiations between two individual parties," and is best understood in that context. Further, unlike here, the scenario in *Foti Fuels* did not involve an ongoing "trade or business" where the defendant "held himself out to the public." Thus, in *Foti Fuels*, the Court was primarily concerned with limiting the Consumer Protection Act's application in the context of purely private transactions not involving the public or consumers in general. The Court did not in any way limit the Attorney General's ability to enforce the law against deceptive acts or practices in commerce that might not involve a specific transaction.

In any event, the State sufficiently alleges that the deceptive acts took place in commerce. The allegations all relate to Defendants' ongoing business of selling gasoline products, in which they hold themselves out to the public, and articulate a "potential harmful effect on the consuming public." *Id*. The alleged "greenwashing" and climate science denial campaigns could reasonably be viewed as deceptive advertising, a prime target of the Consumer Protection Act. It is entirely plausible that false assertions about the science of climate change, particularly if contrary to Defendants' own internal studies, were made for the purpose of maintaining sales of Defendants' products in the face of increasing negative attention. One can reasonably infer from the Complaint that there was an obvious profit motive behind Defendants' allegedly deceptive statements – to increase gasoline sales.

Sunoco separately argues that it has not sold gasoline directly to consumers and that, as an exclusively wholesale supplier, it has not engaged in any acts or practices in commerce. Sunoco's Mot. to Dismiss at 7-8. The Court is not persuaded. Indeed, the Vermont Supreme Court has rejected such a distinction in holding that the Consumer Protection Act's "private remedy section . . . allows suits by 'any consumer' with no suggestion of a distinction between

11

direct and indirect purchasers." *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331, 817 A.2d 9, 13 (2002) (noting that, because the "Legislature clearly intended the [VCPA] to have as broad a reach as possible in order to best protect consumers against unfair trade practices," any restrictions "must be stated in clear terms").[5] Moreover, the Consumer Protection Act expressly authorizes the Attorney General to sue "any person" who "is using or is about to use any method, act, or practice declared by section 2453 of this title to be unlawful." 9 V.S.A. § 2458(a). Nowhere does the "in commerce" requirement exclude wholesale suppliers from the purview of the Act. To be sure, deceptive acts or practices by wholesale suppliers – whose products ultimately reach the retail market – can have just as much of a harmful effect on consumers as deceptive acts by retailers. Allowing the Attorney General to enforce the Act by suing wholesale suppliers promotes the purposes behind the Act, which is remedial in nature. *See Foti Fuels*, 2013 VT 111, ¶ 22 ("This interpretation reinforces the Act's underlying purpose of consumer protection.").

        B.     Falsity.

Defendants also contend that the State has not sufficiently alleged falsity. However, the Consumer Protection Act does not require a plaintiff to allege that any specific statements were actually false. A statement may be deceptive through omission of a material fact. *See Commonwealth v. Exxon Mobil Corp.*, 1984-CV-03333BLS1, 2021 WL 3493456, at *7 (Mass. Super. Ct. June 22, 2021) ("[A]dvertising need not be totally false in order to be deemed deceptive . . . . The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information." (quotation omitted)). For example, a gas/oil company might advertise that its new fuel formula lowers emissions and is better for the environment. That advertising might be technically true if the fuel formula in fact lowers emissions by only one-half mile per gallon or some other de minimus amount. But, in that scenario, the advertising might then create a misleading impression with a reasonable consumer if the advertising fails to fully disclose material information about the fuel formula, for example, the exact amount of lower emissions or the fact that the fuel still significantly contributes to climate change. This determination requires further factual development. *See id.* at *12 ("[T]the court cannot conclude at this stage that no reasonable consumer would be misled by Exxon's promotion of its Synergy™ fuel on its website").

Defendants rely on *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-CV-00194, 2020 WL 2218858, at *7 (D. Vt. May 7, 2020), where the federal court dismissed a consumer protection act claim alleging that Ben & Jerry's misrepresented that the milk and cream in its products was sourced exclusively from dairy farms that met specific criteria. However, *Ehlers* does not weigh in favor of dismissal here. In that case, the plaintiff "base[d] his claim on a

---

[5] Sunoco's attempts to distinguish *Elkins* as applying only to antirust actions are belied by the Court's indication that it found "no reason to treat antitrust cases differently from other [VCPA] cases and prohibit indirect purchasers from bringing suit under § 2461(b)." *Elkins*, 174 Vt. at 341, 817 A.2d at 20. As the Court explained, "[s]ince we have concluded that consumers can generally sue under § 2461(b) even though they are indirect purchasers of a good or service from the defendant, we also hold that they can bring an antitrust case under § 2461(b)." *Id.*

representation that [wa]s neither contained on Ben & Jerry's ice cream cartons nor on its website," and was also not a "reasonable interpretation" of the statements that did appear. *Id*. at *6-7. In contrast, here, Defendants actually represented that their products "lower emissions" and are cleaner. Moreover, *Ehlers* involved the higher federal "plausibility" pleading standard.[6]

## C. Commercial Puffery.

Nor can the Court conclude at this stage of the litigation that the alleged deceptive conduct is mere commercial puffery. "Commercial puffery" is generally non-actionable under consumer protection statutes because it "consists of statements whose truth or falsity . . . cannot be precisely determined, such as a sign in a storefront window promising 'Satisfaction Guaranteed.'" *Meta Platforms, Inc. v. D.C.*, 301 A.3d 740, 759 (D.C. 2023) (quotation omitted). "This sort of general assertion, incapable of measurement, is unlikely to lead reasonable consumers astray and therefore cannot be the basis for a [consumer protection act] violation." *Id.*; *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159-60 (2d Cir. 2007) ("The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific." (quotation omitted)); *Dobbs' Law of Torts* § 676 (describing puffery as "exaggerated and vague statements such as those praising a product as 'first class' or asserting that a given product will last a lifetime"); *see, e.g.*, *Heath v. Palmer*, 2006 VT 125, ¶ 14, 181 Vt. 545 ("Defendants' representations here of 'quality construction' and 'exceptional value' unquestionably fall within the category of opinion as subjective evaluations of workmanship rather than objectively verifiable statements of fact." (citations omitted)).[7]

The alleged deceptive assertions by Defendants that their products are "cleaner," better for the environment, and result in "lower emissions" appear to be capable of objective measurement and thus not puffery. Moreover, "[w]hether a statement is puffery is usually a question of fact." *Dobbs' Law of Torts* § 676; *see also Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 666 (D.C. 2024) ("The puffery rule has not been a favored one, and except in rare cases, the question of whether a statement is an actionable misrepresentation or mere puffery must be left to the jury." (quotation omitted)); *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 98 (2d Cir. 2023) (noting that unless statements are "so patently hyperbolic that it is implausible for a reasonable consumer to be misled," they must be subject to a "fact-intensive inquiry" on how a reasonable buyer would be affected," that "typically should not be resolved on a motion to dismiss"). Thus, even if some of the alleged assertions might constitute mere opinion or puffery, further factual development is required to decider whether they are

---

[6] Shell relies on *Ehlers* to argue that the State has improperly taken Shell's alleged statements out of context. *See* Shell's Mot. to Dismiss at 4-5, 12-14. But again, this argument raises factual disputes for the jury. Moreover, it is not clear that the documents reproduced by Shell are the only places where the alleged misleading statements appear. *See* State's Opp'n at 19 n.27 ("Shell relies upon materials not identified in the Complaint while ignoring other promotional material.").

[7] Interestingly, "[r]ecent scholarship considering puffery in several settings, including false advertising and securities cases, has concluded from empirical studies that a large number of consumers are in fact persuaded by puffery." *Dobbs' Law of Torts* § 677 (citing David A. Hoffman, *The Best Puffery Article Ever,* 91 Iowa L. Rev. 1395, 1444 (2006)).

nonactionable.  Importantly, an expressed opinion might still be "actionable where the defendant misrepresents his opinion as part of a scheme to defraud the plaintiff." *Rodrigue v. Illuzzi*, 2022 VT 9, ¶ 32, 216 Vt. 308; *see also Webb v. Leclair*, 2007 VT 65, ¶ 24, 182 Vt. 559 (mem.) (same); *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 133, 636 A.2d 744, 747 (1993) ("Misrepresentation of opinion can be the basis of a fraud claim if it is part of a scheme to defraud." (citation omitted)).

        D.     Materiality

An omission is material under the Consumer Protection Act if it is "likely to affect [a consumer's] conduct or decision." *PH W. Dover Prop., LLC v. Lalancette Eng'rs*, 2015 VT 48, ¶ 11, 199 Vt. 1; *see also Inkel v. Pride Chevrolet-Pontiac, Inc.*, 2008 VT 6, ¶ 10, 183 Vt. 144 (misrepresentation or omission must "ha[ve] the tendency or capacity to deceive a reasonable consumer" (quotation omitted)); *Kraft, Inc. v. F.T.C.*, 970 F.2d 311, 322 (7th Cir. 1992) ("A claim is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." (quotation omitted)).  "Messages susceptible to multiple reasonable interpretations may violate the Act if just one of those interpretations is false." *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465.  Materiality is "generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision." *Carter v. Gugliuzzi*, 168 Vt. 48, 56, 716 A.2d 17, 23 (1998).  "The federal courts and Trade Commission apply a general presumption of materiality." *Id.*

The Court easily concludes that alleged misrepresentations and omissions by Defendants are material for purposes of a motion to dismiss for failure to state a claim.  It is likely that information about a fuel's carbon emissions and efficiency – as well as a fuel company's environmental practices – would affect a reasonable consumer's choice as to what fuel product to purchase.  The State alleges explicitly that the importance to consumers of information about the climate impacts of fossil fuel use is "well documented" based on polling data, and that Vermont consumers have many potential options in response to such information, including purchasing more fuel-efficient vehicles, using alternative modes of transportation, living closer to their jobs, and telecommuting.  Compl. ¶¶ 170-75.  Therefore, the Complaint more than sufficiently alleges materiality.  *Id.* ¶¶ 95, 118, 120, 170-75.

Defendants contend that the alleged deceptive conduct is not material because, as the State alleges, Vermont consumers "tend to be more ecologically minded than most."  Compl. ¶ 174.  Accordingly, Defendants argue, because Vermont consumers already understand that there is a connection between fossil fuel products and climate change, any additional information they allegedly failed to disclose would not be material.  *See* Exxon's Mot. to Dismiss at 20-22; Citgo's Mot. to Dismiss at 12-13.  The Court disagrees.  If anything, the fact that Vermont consumers "tend to be more ecologically minded than most" makes the alleged deceptive conduct more material, not less, because those consumers presumably would be more likely to change their fuel purchase habits in response to additional information about the environmental impacts of the fuel.

In an attempt to avoid this conclusion, Exxon asserts that no consumer could reasonably interpret its statements as meaning that its products "eliminate . . . emissions altogether." Exxon's Mot. to Dismiss at 22. But that is not what the State claims. Instead, the State asserts that Defendants' misleading advertising created a false impression that their new fuel products substantially lower emissions and have significant environmental benefits, even though any such reduction in emissions and resulting environmental benefits are de minimus.[8] Likewise, at oral argument, Citgo's counsel suggested that the State's argument about Citgo's "TriClean" product advertisements presumes that reasonable consumers are "morons." Counsel stated that based on its advertising, emission reductions from TriClean fuel is "self-evidently a small improvement," and that reasonable consumers know that it is a minimal contribution to reducing carbon emissions. Despite counsel's repeated insistence, the Court cannot conclude at the pleading stage that based on Citgo's advertising, its fuel product's emission reductions are "self-evidently a small improvement." Rather, factual development is needed to explore that assertion. The State's allegation is that through these advertisements and corresponding omissions, Citgo created a misleading impression that Citgo's TriClean product lowers carbon emissions and results in environmental benefits. *See* Compl. ¶¶ 117-18. Thus, a reasonable consumer could believe, based on Defendants' advertisements, that a fuel company has developed a new fuel formula that meaningfully lowers carbon emissions. After all, "[n]ew technologies are being developed and implemented all the time." Steven D. Jamar, *A Social Justice Perspective on the Role of Copyright in Realizing International Human Rights*, 25 Pac. McGeorge Global Bus. & Dev. L.J. 289, 299 (2012).

E.  Liability for API's Statements.

Defendants argue that statements made by the American Petroleum Institute cannot be attributed to them. Derivative liability under the Consumer Protection Act for deceptive statements made by another requires either "direct[] participat[ion]in the unfair or deceptive act" or a "principal-agent relationship with the actor." *Madowitz v. Woods at Killington Owners' Ass'n*, 2014 VT 21, ¶ 32, 196 Vt. 47; *see also Knutsen v. Dion*, 2013 VT 106, ¶ 19, 195 Vt. 512 (same).

The Complaint adequately alleges both an agency relationship between Defendants and API and Defendants' direct participation with API's "greenwashing" campaigns. *See, e.g.*, Compl. ¶ 42 ("Defendants or their predecessors have provided substantial funding, support, and management direction to API, including to the research and messaging leadership of API, and have actively supported and promoted the deceptive messaging campaigns carried out by API with respect to the science regarding climate change and the role of fossil fuels in causing such change."); *id.* ¶ 68 (Defendants gave substantial "payments to API to run a massive campaign of deception on behalf of Defendants and other oil and gas industry participants, misrepresenting to Vermont consumers and others the scientific consensus that fossil fuel products were causing

---

[8] As Shell's counsel noted at oral argument, the State asserts at least once in the Complaint that Defendants' alleged misrepresentations "suggest[] consumers who use the products can 'avoid emissions' altogether." Compl. ¶ 112. Elsewhere, however, the State is plainly focused on alleged misrepresentations of substantial reduction in emissions versus an actual lack of meaningful reduction. *See, e.g.*, Compl. ¶ 108.

climate change."); *id*. ¶ 163 ("API, on behalf of its members, including at times Defendants Exxon, Shell, and Sunoco (and with their knowledge and financial and other support), has facilitated their greenwashing campaigns."). While it remains to be seen whether the State can demonstrate such direct participation or an agency relationship at summary judgment or trial, these allegations are sufficient to survive a motion to dismiss.

F.      Unfairness Claim (Count 2).

Lastly, with respect to the Consumer Protection Act, Defendants contend that the claim for unfair acts and practices in commerce fails to state a claim for the same reasons articulated as to the deception claim. As discussed above, however, the deception claim survives. Thus, the unfairness claim also survives.

In sum, the Court concludes the State has adequately stated its claims against Defendants under the Vermont Consumer Protection Act. The motions to dismiss on such grounds are denied.

IV.     First Amendment.

Defendants next contend that this action violates their right to free speech under the First Amendment to the United States Constitution.

The First Amendment guarantees an individual the right to free speech, "a term necessarily comprising the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988). Generally, this means that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 65 (1983) (quotation omitted). "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (collecting cases).

This protection generally extends to commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). However, "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger*, 463 U.S. at 64-65. Thus, the First Amendment does not protect false or deceptive commercial speech. "[T]he government may freely regulate commercial speech that concerns unlawful activity or is misleading." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623-24 (1995); *see also In re Deyo*, 164 Vt. 613, 614, 670 A.2d 793, 794 (1995) ("For commercial speech to come within that provision, it must at least concern lawful activity and not be misleading." (quotation omitted)). Accordingly, to the extent the State adequately alleges deceptive commercial speech by Defendants, the First Amendment offers no protection.

Defendants contend that the allegations of climate science disinformation and greenwashing target non-commercial, political speech on matters of public concern. It is true that commercial speech has been defined as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561; *see also United States v. United*

*Foods, Inc.*, 533 U.S. 405, 409 (2001) (stating that commercial speech is "usually defined as speech that does no more than propose a commercial transaction"). But it is well established that "[i]n addition to information related to proposing a particular transaction, such as price," commercial speech "can include material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143 (D.C. Cir. 2009); *see also*, e.g., *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 & n.7 (1985) (information and legal advice about defective product and possibility of suing were commercial); *Bolger,* 463 U.S. at 66-68 (1983) (informational brochures discussing "important public issues such as venereal disease and family planning" distributed by contraceptives manufacturer were commercial); *F.T.C. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 38, 43 (D.C. Cir. 1985); (claims that cigarettes contained one milligram of tar and were "99% tar free" were commercial); *Nat'l Comm'n on Egg Nutrition v. FTC,* 570 F.2d 157, 159, 163 (7th Cir. 1977) (holding that egg trade association's advertisements about relationship between eggs and heart disease were commercial speech).

Indeed, as was discussed at oral argument, the U.S. Supreme Court articulated a three-factor analysis for commercial speech in *Bolger*, 463 U.S. at 66-67, including whether the statements are advertisements, whether they reference a specific product, and whether there was an economic motivation. As Exxon's counsel stressed, no one factor, by itself, is dispositive. *Id.* As the State's counsel pointed out, however, a reference to a specific product is not necessary. *See id.* at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial. For example, we express no opinion as to whether reference to any particular product or service is a necessary element of commercial speech.").[9]

In drawing every reasonable inference from the Complaint in the State's favor, as the Court must on a motion to dismiss, the alleged opinion pieces denying climate science and greenwashing campaigns can reasonably be viewed as having been "asserted for the purpose of persuading the public to purchase the product." *Philip Morris*, 566 F.3d at 1143. Moreover, the State alleges that the climate science disinformation statements were "advertorials," or advertisements disguised as opinion pieces. *See* Compl. ¶ 88. That is a factual issue that the Court cannot resolve on a motion to dismiss. *See Exxon Mobil Corp.*, 2021 WL 3493456, at *14 ("This court is not in a position, at least at this stage, to determine whether any particular statement is protected by the First Amendment."). As noted above, that the opinion pieces and "greenwashing" campaigns might not directly reference a specific product for sale is not dispositive. *Bolger*, 463 U.S. at 67 n.14.

---

[9] At oral argument, Exxon's counsel pointed to *Harris v. Quinn* as the "last word" from the Supreme Court regarding the definition of commercial speech. 573 U.S. 616, 648 (2014) ("Our precedents define commercial speech as 'speech that does no more than propose a commercial transaction.'"). However, the *Harris* Court's statement, which merely repeated a well-established general notion of commercial speech, repeated in *Bolger*, did not overturn years of precedent or narrow the concept of commercial speech to the definition preferred by Defendants. *See, e.g.*, *Bolger*, 463 U.S. at 66 (noting that "the core notion of commercial speech" is "speech which does no more than propose a commercial transaction" (quotation omitted)).

Defendants further assert that some of their alleged climate science disinformation and greenwashing campaigns constitute lobbying or other petitioning activity protected by the *Noerr-Pennington* doctrine. *See* Citgo's Mot. to Dismiss at 26-27; Shell's Mot. to Dismiss at 26; Sunoco's Mot. to Dismiss at 23 n.25; Exxon's Mot. to Dismiss at 28-29. Even assuming that any of the alleged statements are lobbying or petitioning under *Noerr-Pennington*, the doctrine offers no protection here because the State alleges that the statements are misleading. "Where statements are deliberately false or misleading, *Noerr-Pennington* does not apply." *Philip Morris*, 566 F.3d at 1124 (D.C. Cir. 2009); *see also McDonald v. Smith,* 472 U.S. 479, 485 (1985) (finding that Petition Clause does not have "special First Amendment status" and that petitions are not entitled to "greater constitutional protection" than "other First Amendment expressions").

Accordingly, Defendants are not entitled to dismissal on First Amendment grounds.

V.      Commerce Clause.

Exxon and Sunoco contend that the relief sought by the State violates the Commerce Clause. Specifically, they argue that requiring them to disclose that fossil fuels remain the focus of their business and will continue to contribute substantially to climate change in every statement that could possibly find its way into Vermont would have the practical effect of controlling their conduct beyond the State's boundaries. *See* Exxon's Mot. at 30-31; Sunoco's Mot. at 25.

"The Commerce Clause serves to further free trade among the states." *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 19, 176 Vt. 465. "The party urging a violation of the clause based on a statute that makes no distinction between in-state and out-of-state residents must demonstrate that the statute has a disproportionate impact on out-of-state residents." *Id*. "Generally speaking, [it] protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336-37 (1989). "[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Id*. at 332. However, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The State's requested relief would not have the "practical effect" of regulating commerce occurring "wholly outside" Vermont's borders. The action is based on Vermont's Consumer Protection Act and alleges that deceptive statements are intended to influence Vermont consumers and their purchasing decisions as to fossil fuel products. While the specific requested relief might have an incidental effect on interstate commerce, this Court has no basis at this stage of the proceedings to conclude that any burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id*. at 142. Protecting Vermont consumers from deceptive advertising and promotion of fossil fuel products is obviously a "legitimate local public interest." *Id*. Other courts have rejected such Commerce Clause challenges. *See*, *e.g.*, *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138, 1152 (D.N.M. 2009)

(rejecting Commerce Clause challenge to New Mexico consumer protection statute); *Bronco Wine Co. v. Jolly*, 29 Cal. Rptr. 3d 462, 481-92 (Ct. App. 2005) (California statute restricting use of misleading wine labels did not violate Commerce Clause).

Moreover, the "Commerce Clause argument is premature in that it addresses only proposed relief." *Fed. Trade Comm'n v. Roomster Corp.*, 654 F. Supp. 3d 244, 254 (S.D.N.Y. 2023). In other words, even if the specific requested relief violated the Commerce Clause, it may be possible to tailor it in a less restrictive manner. That can be addressed later, in the event that Defendants are found to have violated the Consumer Protection Act. Thus, the Commerce Clause does not provide grounds for dismissal.

## VI. Political Question Doctrine.

Exxon contends that the Complaint presents a non-justiciable political question in that it seeks "to usurp the power of the political branches by enacting disclosure regulations through tort liability." Exxon's Mot. at 31. It asserts that the amount of regulation related to greenhouse gas-producing products is a "complex policy judgment" best left to the legislative and executive branches. *Id*. at 32.

The Supreme Court has articulated six factors to consider in addressing concerns about "political questions." *See Turner v. Shumlin*, 2017 VT 2, ¶ 19, 204 Vt. 78 (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962) and *Brady v. Dean*, 173 Vt. 542, 544, 790 A.2d 428, 431 (2001)). Based on those factors, there is clearly no political question here. The State does not seek to "usurp" the political branches' power "by enacting disclosure regulations through tort liability." Instead, the State seeks merely to remedy Defendants' alleged deceptive acts and practices in marketing and selling fossil products to consumers. The Vermont legislature has already authorized such actions by enacting the Consumer Protection Act and explicitly empowering the Attorney General to enforce it. The political question doctrine is not a basis to dismiss the Complaint.

## VII. Disgorgement.

Exxon also asks the Court to strike the State's request for a "judgment requiring Defendants to disgorge all funds acquired and/or retained as a result of any acts or practices found to be unlawful." Exxon's Mot. at 34-36. Exxon contends that such relief is not authorized under the Consumer Protection Act, and that any disgorgement cannot exceed "ill-gotten profits." *Id*. at 35.

Exxon's request to strike the State's disgorgement request is premature and is more appropriately addressed after a violation, if any, if found. But in any event, Exxon is incorrect. The Act broadly authorizes a wide array of potential relief: "[T]he Attorney General . . . may request and the court is authorized to render any other temporary or permanent relief, or both, as may be in the public interest . . . ." 9 V.S.A. § 2458(b). While the Act explicitly enumerates three types of remedies (civil penalties, restitution, and reimbursement for reasonable investigation and prosecution expenses), *see id*., nowhere does it limit the available relief to those three specific remedies. Exxon's reliance on *AMG Cap. Mgmt., LLC v. Fed. Trade*

19

*Comm'n*, 593 U.S. 67, 75 (2021) is misplaced. There, the U.S. Supreme Court held that a section of the FTC Act authorizing the FTC to obtain injunctive relief did not also authorize equitable monetary damages. *Id*. Importantly, however, the federal statutory language refers only to injunctions and includes nothing close to the broad language of Vermont's Consumer Protection Act. *Compare* 15 U.S.C.A. § 53(b) ("in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction") *with* 9 V.S.A. § 2458(b) ("In addition to the foregoing, the Attorney General . . . may request and the court is authorized to render any other temporary or permanent relief, or both, as may be in the public interest . . . .").

<u>Order</u>

For the foregoing reasons, Defendants' Motions to Dismiss (Mots. 2-7) are DENIED.

Defendants shall file their Answers within 21 days. The parties shall file a proposed discovery schedule within 30 days thereafter.

Electronically signed on December 10, 2024 at 4:02 PM pursuant to V.R.E.F. 9(d).

_____
Megan J. Shafritz
Superior Court Judge

20